**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 18-4414**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

MARCUS ROOSEVELT TAYLOR,

Defendant - Appellant.

**No. 18-4453**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

DANIEL THOMAS HERSL,

Defendant - Appellant.

Appeals from the United States District Court for the District of Maryland, at Baltimore.
Catherine C. Blake, District Judge.  (1:17-cr-00106-CCB-6) (1:17-cr-00106-CCB-3)

Argued:  September 20, 2019                    Decided:  November 5, 2019

Before NIEMEYER, KEENAN, and RUSHING, Circuit Judges.

---

Affirmed by published opinion. Judge Niemeyer wrote the opinion, in which Judge Rushing joined and Judge Keenan joined in part. Judge Keenan wrote a separate concurring opinion.

---

**ARGUED:** Stuart A. Berman, LERCH, EARLY & BREWER, CHARTERED, Bethesda, Maryland; Henry Mark Stichel, ASTRACHAN GUNST & THOMAS PC, Baltimore, Maryland, for Appellants. Leo Joseph Wise, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee. **ON BRIEF:** C. William Michaels, Baltimore, Maryland, for Appellant Marcus Roosevelt Taylor. Nida Kanwal, LERCH, EARLY & BREWER, CHARTERED, Bethesda, Maryland, for Appellant Daniel Thomas Hersl. Robert K. Hur, United States Attorney, Derek E. Hines, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Baltimore, Maryland, for Appellee.

---

NIEMEYER, Circuit Judge:

In February 2017, a federal grand jury indicted seven officers of the Baltimore City Police Department for their participation in a racketeering conspiracy and substantive acts of racketeering, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962, as well as other related crimes. The officers, who were members of the Police Department's Gun Trace Task Force ("GTTF"), were charged with robbing citizens during the course of their police service, taking money, jewelry, and other items. They were also charged with committing fraud in obtaining overtime pay from the Police Department. Four officers pleaded guilty and cooperated by testifying at trial. One officer pleaded guilty and did not testify. And two, Marcus Taylor and Daniel Hersl, the appellants, went to trial and were convicted of RICO conspiracy, in violation of 18 U.S.C. § 1962(d); substantive acts of RICO, in violation of 18 U.S.C. § 1962(c); and Hobbs Act robbery, in violation of 18 U.S.C. § 1951. The district court sentenced each to 216 months' imprisonment.

On appeal, Taylor and Hersl contend that the evidence was insufficient to convict them. In particular, they contend (1) that the evidence failed to show that they had committed wire fraud under 18 U.S.C. § 1343, one of the predicates for the RICO counts, in that no evidence was introduced at trial to show that they could foresee that the paper slips the officers used to fraudulently claim overtime pay would cause *a transmission by wire in interstate commerce* and (2) that the evidence failed to show that they had committed acts constituting Hobbs Act robbery or robbery under Maryland law, another alleged predicate for the RICO violations. Taylor and Hersl also contend that the court

3

abused its discretion in denying various trial-related motions, thereby prejudicing them. Finally, they challenge the substantive reasonableness of their sentences.

For the reasons that follow, we affirm.

I

After four officers in the Police Department's GTTF pleaded guilty and agreed to cooperate by testifying at the trials of the remaining officers, the grand jury returned a six-count superseding indictment against Sergeant Wayne Jenkins, the officer in charge of the GTTF; Detective Marcus Taylor; and Detective Daniel Hersl.

Count I charged the defendants with RICO conspiracy under 18 U.S.C. § 1962(d), alleging that the Baltimore City Police Department was the enterprise through which the defendants engaged in a racketeering conspiracy, whose predicate offenses included wire fraud, in violation of 18 U.S.C. § 1343; robbery, attempted robbery, and conspiracy to commit robbery, in violation of Maryland law; extortion, attempted extortion, and conspiracy to commit extortion by a government officer, in violation of Maryland law; and controlled substance offenses, in violation of 21 U.S.C. §§ 841 and 846.

Count II charged the defendants with substantive racketeering, in violation of 18 U.S.C. § 1962(c), setting forth 22 predicate racketeering acts, each identified by date and name of victim. Many of the racketeering acts identified in Count II overlapped with the constituent crimes alleged in Count I as acts in furtherance of the conspiracy.

Count III charged Jenkins and Taylor with Hobbs Act robbery for the alleged robbery of Oreese Stevenson on March 22, 2016, in violation of 18 U.S.C. § 1951.

4

Count IV charged Jenkins and Taylor with possession of a firearm in furtherance of a crime of violence, namely the Hobbs Act robbery charged in Count III, in violation of 18 U.S.C. § 924(c).

Count V charged Jenkins and Hersl with Hobbs Act robbery for the robbery of Ronald and Nancy Hamilton on July 8, 2016, in violation of 18 U.S.C. § 1951.

And Count VI charged Jenkins and Hersl with possession of a firearm in furtherance of a crime of violence, namely the robbery alleged in Count V, in violation of 18 U.S.C. § 924(c).

Jenkins pleaded guilty before trial but ultimately did not testify, and the trial commenced against Taylor and Hersl.

The government presented testimony from over a dozen witnesses, including the four former GTTF officers who had pleaded guilty and agreed to cooperate. The former officers all testified that, during their time in the GTTF (and, for some, during their prior assignment on a Special Enforcement Section of the Police Department), they conducted illegal searches and stole money, drugs, and other items while acting in a law enforcement capacity. They also testified that they submitted overtime forms for themselves and for other GTTF officers for hours that they had not worked.

More particularly, the government presented evidence to show that GTTF officers, including Taylor, targeted a drug dealer, Oreese Stevenson, as he was in a minivan selling cocaine to Demetrius Brown. In searching the vehicle, the officers found cocaine and a backpack containing money. Stevenson testified at trial that, while he had not counted the money, he expected the bag to contain approximately $21,500 from Brown as payment for

5

the cocaine. He explained that he knew Brown and that Brown had always brought the correct amount of money. But after Taylor seized the money from the vehicle, he brought only $15,000 to police headquarters, and that $15,000 was submitted to the evidence control unit of the Police Department. After this stop and seizure, the GTTF officers went to Stevenson's house and did what they called a "sneak-and-peek," which involves, as one former officer testified, "go[ing] [into someone's home] without [anybody] knowing and sneak[ing] around the house and tak[ing] a peek and search[ing] through the house without a search warrant." During the search, they uncovered cocaine and a safe, and some officers then left to obtain a search warrant. Upon returning with the warrant, officers pried open the safe and found $200,000. After taking $100,000 for themselves, they reported that only $100,000 had been found in the safe. The officers, including Taylor, then split the $100,000 among themselves.

The government also presented evidence to show that GTTF officers, including Hersl, targeted Ronald Hamilton, who they believed to be a "big-time drug dealer," stopped him, and, after he acknowledged having about $40,000 in his house, drove to his house, entering it without a warrant. As a result of the search of his house, the officers uncovered some $70,000. Of that, they took $20,000, leaving $50,000 to be discovered by the Maryland State Police to legitimize the encounter. The officers, including Hersl, then split the $20,000 among themselves. Hamilton testified that some of the money was used in carrying out his used car business, which he conducted on a cash basis. He stated that he purchased cars from dealer auctions in Manheim, Pennsylvania; Bel Air, Maryland; and

6

Jessup, Maryland, and sold them on the Internet or by word of mouth. The cash seized, he testified, represented money from the sale of cars and from his gambling.

With respect to the overtime fraud, the government presented evidence that the defendants regularly submitted overtime slips on their own behalf and on behalf of other GTTF officers for hours that they had not worked. To do so, the officers listed the hours that they had purportedly worked on overtime slips and submitted them to the unit timekeeper. Using a computer, the timekeeper then entered the information into a timekeeping service from ADP, the third-party company that the Police Department had hired to process its data. FBI Special Agent Erika Jensen testified that Sgt. Jenkins (or Sgt. Thomas Allers, who had been in charge of the GTTF prior to Jenkins) would authorize the officers' overtime hours by signing off on them and turning them "into the system." After the data were received by ADP in South Dakota, the officers were ultimately paid either by check or, in most cases, by direct electronic deposit into their bank accounts. The defendants' overtime pay during the relevant period almost matched their base salaries, doubling their pay.

The jury found Taylor and Hersl guilty of RICO conspiracy (Count I), substantive racketeering (Count II), and Hobbs Act robbery (Counts III and V), but it acquitted them of possession of a firearm in furtherance of a crime of violence (Counts IV and VI).

The district court sentenced each defendant to 216 months' imprisonment on each count, to be served concurrently, which was near the low end of the advisory Guidelines range.

From the judgments of conviction — dated June 13, 2018, for Taylor, and June 26, 2018, for Hersl — the defendants filed these appeals, which we consolidated by order dated July 3, 2018.

II

Taylor and Hersl contend first that their convictions on Count I for a RICO conspiracy, in violation of 18 U.S.C. § 1962(d), should be reversed because the government failed to prove a pattern of racketeering activity — which may be shown by at least two racketeering acts — by presenting insufficient evidence in support of the necessary elements of wire fraud under 18 U.S.C. § 1343, one of the acts found by the jury. They argue that to show a violation of § 1343, the government had to prove that the use of interstate wires was "reasonably foreseeable" to at least one conspirator. They maintain that although "[t]he government proved without dispute that the process leading to paying overtime to . . . officers involved the use of interstate wires," it "offered literally no evidence to prove that the use of the wires was foreseeable to Hersl, Taylor, or other conspirators." More particularly, they assert that "the government introduced no evidence whatsoever that it was reasonably foreseeable to Hersl, Taylor, or coconspirators that the submission of overtime slips would lead to wire communications between [the Police Department] and ADP, let alone interstate wire transmissions from Maryland to South Dakota [where ADP's servers for the payroll system were located]."

To convict the defendants of RICO conspiracy, as charged in Count I, the government was required to prove "the existence of a RICO enterprise in which the

8

defendant conspired to participate, and that the defendant conspired that a member of the enterprise would perform at least two racketeering acts constituting a pattern of racketeering activity." *United States v. Pinson*, 860 F.3d 152, 161 (4th Cir. 2017) (cleaned up) (citing *Salinas v. United States*, 522 U.S. 52, 62 (1997)). And to establish a "pattern of racketeering activity," the government was required to prove, as the district court instructed the jury, that "the conspiracy involved or would have involved the commission of [at least] two racketeering acts." *See also* 18 U.S.C. § 1961(5). The RICO statute defines qualifying racketeering acts to include certain state law crimes, such as robbery, and acts indictable under specific federal statutes, including wire fraud. *Id*. § 1961(1).

As the indictment charged and the jury found, the Police Department was the enterprise through which Hersl and Taylor conspired with other GTTF officers to enrich themselves by committing various racketeering acts. The jury also found, as to each of the defendants, one act constituting robbery under Maryland law and one act constituting wire fraud under 18 U.S.C. § 1343. Consequently, if the evidence was insufficient to support a finding that the defendants' conduct constituted wire fraud under § 1343, as the defendants contend, one of the two necessary acts would be voided, requiring reversal of the defendants' convictions on Count I.

The wire fraud statute provides that "[w]hoever, having devised or intending to devise any scheme or artifice to defraud, . . . transmits or causes to be transmitted by means of wire . . . communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice . . . shall be [punished]." 18 U.S.C. § 1343. Thus, to establish a violation of the statute, the government

9

must prove (1) the existence of a scheme to defraud and (2) the fact that the defendant used or caused the use of wire communications in furtherance of that scheme. *See United States v. Burfoot*, 899 F.3d 326, 335 (4th Cir. 2018); *United States v. Jefferson*, 674 F.3d 332, 366 (4th Cir. 2012). As the district court instructed the jury in this case, it is "not necessary for the defendant to be directly or personally involved in the wire communication as long as that communication was reasonably foreseeable in the execution or the carrying out of the alleged scheme to defraud in which the defendant is accused of participating." *See also Burfoot*, 899 F.3d at 335 ("One 'causes' the use of a wire communication when one acts with knowledge that such use will follow in the ordinary course of business or when such use can reasonably be foreseen, even though not actually intended" (cleaned up)). Whether the use of wire transmissions can be reasonably foreseen is determined under an objective standard. *See United States v. Edwards*, 188 F.3d 230, 234 (4th Cir. 1999).

At the outset, we conclude that the *interstate nexus* required in § 1343 is a jurisdictional element — rather than a substantive element — of the crime of wire fraud. *See Torres v. Lynch*, 136 S. Ct. 1619, 1630 (2016) (recognizing "a settled practice of distinguishing between substantive and jurisdictional elements of federal criminal laws"). And while the government is generally required to prove a defendant's *mens rea* with respect to substantive elements of a crime, such proof is not required for a jurisdictional element. *See id.* at 1631. As the Second Circuit observed:

> The use of interstate communication . . . is included in the [wire fraud] statute merely as a ground for federal jurisdiction. The essence of the crime is the fraudulent scheme itself. . . . If the wire employed is an interstate wire the requirements for federal jurisdiction are satisfied. It is wholly irrelevant to

> any purpose of the statute that the perpetrator of the fraud knows about the use of interstate communication.

*United States v. Blassingame*, 427 F.2d 329, 330 (2d Cir. 1970); *see also United States v. Jinian*, 725 F.3d 954, 965 (9th Cir. 2013) (holding that the interstate nexus in § 1343 is "jurisdictional and not a substantive element of a wire fraud offense"); *United States v. Tum*, 707 F.3d 68, 73 (1st Cir. 2013) ("The wire-fraud statute's interstate-nexus requirement is purely jurisdictional and not a substantive element of the offense"); *accord United States v. Darby*, 37 F.3d 1059, 1067 (4th Cir. 1994) (holding that similar language in 18 U.S.C. § 875(c) (requiring transmission of communications to be in "interstate commerce") did not require the government "to prove that [the defendant] knew of the interstate nexus" because "criminal statutes based on the government's interest in regulating interstate commerce do not generally require that an offender have knowledge of the interstate nexus of his actions"). *Cf. United States v. Bentz*, 21 F.3d 37, 40–41 (3d Cir. 1994) (drawing no clear distinction between the foreseeability of a wire transmission and the foreseeability of an interstate wire transmission in holding that the government had presented insufficient evidence to show the foreseeability of *any* wire transmissions).

We also conclude that the evidence in this case of the *interstate nexus* — taking it in the light most favorable to the government, as we must — was sufficient to satisfy the jurisdictional element. The evidence shows that the defendants and their coconspirators submitted fraudulent paper timeslips on their own behalf and on behalf of others in the conspiracy, claiming overtime hours for work that they had not performed. These slips were submitted to coconspirator Sgt. Jenkins for approval and to the timekeeper clerk, who

11

entered them into the "eTIME" computer program for processing by ADP, which provided the software and servers for the Police Department's payroll processing. An executive of ADP explained that the Police Department used two of its services — payroll processing on technology known as Enterprise Payroll Services, or EPS, and a timekeeping system called "eTIME." To provide these services, ADP operated a mainframe system with servers located in Sioux Falls, South Dakota. The executive added, "ADP owns the servers and hosts [the products], and the [Police Department] just processes payroll through those servers." He stated that when the Police Department "upload[ed] time and attendance information into this system, [that] create[d] electronic wire communications." Following receipt of the communications in South Dakota, checks were issued or, in "most cases," funds were transferred directly into officers' accounts.

This evidence amply demonstrates that the defendants' and their coconspirators' submissions of fraudulent overtime slips "cause[d] to be transmitted by means of wire . . . communication in interstate . . . commerce . . . writings, signs, [or] signals . . . for the purpose of executing such [fraudulent] scheme or artifice." 18 U.S.C. § 1343.

While the defendants do not appear to challenge that conclusion, they argue that the record contains insufficient evidence from which the jury could have concluded that (1) the wire transmissions and (2) their interstate nexus *were foreseeable to them or to any coconspirator*. As discussed, the fact that the wire transmissions were *in interstate commerce* need not have been foreseeable to a defendant, as we conclude that the interstate commerce aspect is jurisdictional. But this conclusion still leaves open the question raised by the defendants of whether *any* wire transmissions, whether or not in interstate

12

commerce, were foreseeable to the defendants or any coconspirator. Under the appropriate standard for finding foreseeability, of course, the question is more accurately posed as whether the use of wire transmissions could "*reasonably* be foreseen," *Burfoot*, 899 F.3d at 335 (emphasis added), and that is an objective standard focusing on a reasonable officer in the position of the defendants and coconspirators, *see Edwards*, 188 F.3d at 234. We conclude that the jury's finding that wire transmissions were reasonably foreseeable is sufficiently supported by the evidence, considered as a whole and taken in the light most favorable to the government.

The evidence illustrating officers' general awareness of the overtime submission process especially in conjunction with Sgt. Jenkins's specific interactions with that process, and the officers' general awareness of the electronic mechanisms for receiving pay, was sufficient to establish that the officers could reasonably have foreseen the use of wire transmissions as part of the Police Department's overall timekeeping and payroll process. First, there was evidence from FBI Special Agent Jensen's testimony that paper overtime slips filled out by the defendants were approved and "turned in" to "the system" by Sgt. Jenkins, a coconspirator. Jenkins, the officer in charge of the GTTF, was afforded more direct access to the process, and for this reason, foreseeability that the paper slips would be entered into a computer by the unit timekeeper, generating wire communications, could reasonably be ascribed. More broadly, the evidence showed that the timekeeper clerks, who entered the timeslip data into computers for processing, physically worked in the Police Department, where the officers also worked. It would be reasonable to infer from the centrality of the pay system to the Police Department's overall operations that

13

employees would generally be aware of the process, including that it involved wire transmissions.  Finally, although it is unclear whether Taylor and Hersl were paid by check or electronic deposit — a means surely subject to their election — it was, in either event, reasonably foreseeable that the general process would at some stage involve wire transmissions.  This is especially true in light of the prevalence of technology in 2016 and the needs of an operation the size of the Baltimore Police Department.  Indeed, coconspirator Maurice Ward specifically affirmed this understanding, acknowledging that the overtime slips "get processed," which requires "a couple of weeks for [them] to be reflected in [his] paycheck."

Considering all of this evidence together and taking it in the light most favorable to the government, we conclude that the record contains sufficient evidence to support the jury's findings as to wire fraud under 18 U.S.C. § 1343 in support of its verdicts on Count I, charging Taylor and Hersl with RICO conspiracy, and therefore we affirm their convictions on this count.

III

Taylor and Hersl challenge their convictions on Count II for substantive racketeering, in violation of 18 U.S.C. § 1962(c), by challenging the sufficiency of the evidence as to the underlying racketeering acts, which must number at least two to establish the requisite "pattern of racketeering activity."  In its verdicts, the jury found that Taylor committed six such acts — three robberies or conspiracies to commit robbery under Maryland law and three acts of overtime-related wire fraud, in violation of 18 U.S.C.

14

§ 1343 — and that Hersl committed eight such acts — four robberies or conspiracies to commit robbery under Maryland law and four acts of overtime-related wire fraud, in violation of § 1343. The defendants acknowledge that their convictions on Count II will stand as long as there was sufficient evidence to support the jury's finding that each defendant committed at least two racketeering acts. Thus, Taylor must invalidate at least five acts, and Hersl seven, to have their convictions on Count II reversed.

In attacking the predicate racketeering acts on which their convictions rest, the defendants contend that all the wire fraud racketeering acts should fall because of the government's failure to prove foreseeability, just as they argued in challenging Count I. And they attack the robbery predicates on the grounds that either they were not involved or the events as they unfolded did not meet the requirements for robbery or conspiracy to commit robbery under Maryland law.

Because, as discussed in connection with Count I, we reject the defendants' argument that the government failed to present sufficient evidence of foreseeability as necessary to establish wire fraud and because the jury found that each defendant committed more than two such acts of wire fraud, we need not address the defendants' challenge to the robbery predicates. Accordingly, their convictions on Count II are affirmed.

IV

Both Taylor and Hersl challenge their convictions for Hobbs Act robbery, as charged in Count III for Taylor and in Count V for Hersl.

15

The Hobbs Act penalizes a person who "in any way or degree obstructs, delays, or affects commerce or the movement of any article or commodity in commerce, by robbery or extortion . . . or commits or threatens physical violence to any person or property in furtherance of a plan or purpose to do any thing in violation of this section." 18 U.S.C. § 1951(a). "Commerce" is defined as interstate in nature, *see id.* § 1951(b)(3), while "robbery" is defined, in relevant part, as "the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury, immediate or future, to his person or property," *id.* § 1951(b)(1).

Both defendants contend that the evidence was insufficient to establish that their conduct met the statutory definition of robbery. Hersl also contends that the government failed to establish that his alleged robbery of Ronald and Nancy Hamilton affected interstate commerce. We address each defendant's arguments in order.

A

Taylor's Hobbs Act conviction on Count III was predicated on the alleged robbery of Oreese Stevenson on March 22, 2016. On that date, officers surrounded the minivan Stevenson was driving and allegedly took over $6,500 from the $21,500 found in the van and then, after searching Stevenson's residence, took $100,000 of the $200,000 found there. Taylor contends that no robbery occurred at the minivan because, according to him, the only items removed from the vehicle were properly turned over to the Police Department's evidence control unit. And he contends that no robbery occurred at his

16

residence because nothing was taken "from the person or in the presence of another," as required by the Hobbs Act's definition of robbery.

Taking the evidence in the light most favorable to the government, we conclude that it was sufficient for the jury to infer that Taylor robbed Stevenson and his passenger, Demetrius Brown, when he took a portion of the cash seized from the van.

Stevenson testified that he was sitting in his van and conducting a transaction to sell Brown one-half kilogram of cocaine for $21,500, when Taylor and three other officers surrounded the van, blocked it with one of their vehicles, removed the two men, and handcuffed them. The officers told Stevenson that his front windshield was illegally tinted, but Stevenson denied that any tint had been added. The officers then seized the cocaine and a backpack of money from the van, which Stevenson believed contained the $21,500 he expected Brown to pay him for the cocaine. When explaining at trial why he believed that the bag contained $21,500, Stevenson testified, "That was *the deal* [he] [was] going to sell it for." (Emphasis added). He also testified that he knew Brown and Brown "always ha[d] the correct money." And again he confirmed that $21,500 is "what should have been in the bag."

One of the officers who had been at the scene testified that it was Taylor who removed the bag of money from the car and that Taylor later told him that the bag contained $15,000. Although the officer did not know what Taylor did with the money after seizing it from the van, it was undisputed that only $15,000 was submitted to the police evidence control unit.

17

Viewing this testimony in the light most favorable to the government, we conclude that it would have been reasonable for a jury to find that there had originally been more than $15,000 in Stevenson's van and that Taylor participated in taking the missing amount from Stevenson and Brown before the remainder was submitted to the evidence control unit. Accordingly, we affirm Taylor's conviction under Count III.

B

Hersl's Hobbs Act conviction on Count V was predicated on the alleged robbery of Ronald and Nancy Hamilton on July 8, 2016. On that date, Hersl and three other officers entered the Hamiltons' house without a warrant, searched the house in their presence, found approximately $70,000, and took $20,000 to divide among themselves. Hersl contends that the government established, at most, that he was present while the three other officers — Sgt. Jenkins, Det. Jemell Rayam, and Det. Momodu Gondo — robbed the Hamiltons and that his mere presence was insufficient for a jury to conclude that he was involved in the robbery.

But the record does not support Hersl's claim that he was simply an innocent bystander. To begin, he entered the house with the other officers without a warrant, surely knowing that they were not legally entitled to conduct a search of the house. Indeed, the government's evidence indicated that the officers had no plans to search the Hamiltons' house until they stopped the Hamiltons in their car, robbed Hamilton of $3,400 from his pocket, and learned that Hamilton kept money at his house. Once there, Hamilton testified that Hersl guarded him and his wife in the living room while the other officers searched

18

the house. Testimony also showed that Hersl became aware of the $70,000 that was found, a portion of which he was later given and accepted. In addition, Rayam testified that after the officers found $20,000 in loose cash in the Hamiltons' bedroom, Hersl was briefly alone with the money. Rayam later realized that $3,000 of the $20,000 was missing. He testified that Gondo believed Hersl took the missing cash and so informed Sgt. Jenkins, who nonetheless decided to "leave it alone" and to split the remaining $17,000 between the four officers, so as not to cause problems. Even if it was not sufficiently proved that Hersl stole the missing $3,000, he surely knew that the $17,000 that the officers took and divided among themselves was the product of the robbery that all four officers had just committed. We conclude that a jury could well have drawn the reasonable inference that Hersl was not a mere bystander.

Hersl also argues that even if he was involved in robbing the Hamiltons, a robbery of personal savings from a private home does not have the effect on interstate commerce required by the Hobbs Act.

Hamilton testified, however, that he earned the money that had been taken from his bedroom through "cars and gambling," although he did not specify how much came from either endeavor. Testifying about his car business, which operated solely on cash, Hamilton explained that he purchased cars at dealer auctions in Manheim, Pennsylvania; Bel Air, Maryland; and Jessup, Maryland and then sold them over the Internet or through word of mouth. This evidence, we conclude, sufficiently satisfies the jurisdictional requirement of the Hobbs Act.

19

"[T]he jurisdictional predicate of the Hobbs Act requires only that the government prove a minimal effect on interstate commerce." *United States v. Taylor*, 754 F.3d 217, 222 (4th Cir. 2014) (cleaned up). In *Taylor*, we held that the government may satisfy the Hobbs Act's jurisdictional requirement under at least two different theories, the pertinent one being by showing a reasonable probability that the defendants' actions depleted the assets of an entity engaged in interstate commerce. 754 F.3d at 224–26; *see also United States v. Buffey*, 899 F.2d 1402, 1404 (4th Cir. 1990). Under this theory, the interstate nexus may be shown "by proof of probabilities without evidence that any particular commercial movements were affected." *Buffey*, 899 F.2d 1404 (cleaned up). We have held that "the effect [on interstate commerce] may be so minor as to be *de minimis*." *Taylor*, 754 F.3d at 222. Moreover, "[t]he question is not simply whether one particular offense has a measurable impact upon interstate commerce, but whether the relevant class of acts has such an impact." *United States v. Williams*, 342 F.3d 350, 355 (4th Cir. 2003). Although there is some difference in how the circuits articulate the jurisdictional requirement of the Hobbs Act, *see, e.g.*, *United States v. Wang*, 222 F.3d 234, 239–40 (6th Cir. 2000) (seeming to set a monetary threshold to establish a sufficient effect on interstate commerce), *Taylor* makes clear that the depletion of assets theory requires no minimum dollar amount, 754 F.3d at 225.

While Hamilton did not quantify how much of his business he conducted out of state, a rational jury could have concluded that, since he testified to purchasing cars from only three locations, his purchases from Manheim, Pennsylvania, constituted a substantial portion of his inventory. And we have recognized that a business that purchases "a

20

substantial portion of its inventory from out-of-state suppliers is engaged in interstate commerce for purposes of the Hobbs Act." *United States v. Tillery*, 702 F.3d 170, 174 (4th Cir. 2012) (cleaned up). In addition, Hamilton specifically testified that some of the cash found in the bedroom came from selling cars, a portion of which came from Pennsylvania. Because there is no dollar-amount minimum under the depletion of assets theory, the fact that Hamilton did not specify the particular amount derived from cars that he purchased in Manheim is not dispositive. We therefore conclude that the evidence was sufficient to satisfy the jurisdictional requirement of the Hobbs Act.

V

The defendants challenge the district court's exercise of discretion in denying various motions related to the trial. Discretion related to the management of trial is, of course, broad, and we will reverse only if we find prejudicial abuse.

A

First, the defendants contend that the district court abused its discretion by denying their pretrial motion in limine to prohibit the government and its witnesses from using the term "robbery" during trial and by overruling their subsequent objection at trial to its use, especially in reference to the alleged predicate acts of the RICO counts. They argue that the government's use of the term "robbery" was prejudicial because to convict the defendants on the RICO counts, the jury was required to conclude that Hersl and Taylor's encounters with victims in fact constituted robberies, rather than non-predicate offenses, such as thefts or burglaries. They maintain that the use of the term was not only unfairly

21

prejudicial under Federal Rule of Evidence 403, but also improper under Rules 701 and 704, which regulate lay witness testimony in the form of an opinion and expert testimony in lay witness clothing.

The government argues that the district court did not err in denying the defendants' motion in limine and that it used the term "robbery" only when necessary, particularly when a coconspirator testified that he had pleaded guilty to robbery as a predicate offense. Moreover, it contends that the coconspirators' use of the term "robbery" was not improper lay witness testimony in the form of opinion because it was *a fact* that each of the coconspirators had pleaded guilty to *robbing* civilians, and whether Taylor and Hersl committed robbery was an issue properly committed to the jury to decide. *See* Fed. R. Evid. 701, 704.

The record shows that Ward, one of the coconspirators, testified that he had pleaded guilty to "[c]omitting robberies and also fraud in Baltimore City of overtime." After he described his plea, the district court instructed the jury not to draw any conclusions about the guilt of the defendants based on the guilty pleas of any testifying coconspirators. Coconspirators Evodio Hendrix, Rayam, and Gondo similarly used the term "rob" to describe the conduct accompanied by their guilty pleas, and the government's follow-up questions often repeated their language. When Hersl's counsel objected to the government's use of the term "robbery" during Rayam's testimony, the court reminded the government to rephrase its questions when possible so as not to use that term. Finally, at the close of the evidence, the court again reminded the jury to "draw no conclusions or inferences of any kind about the guilt of the defendants on trial from the fact that a

22

prosecution witness pled guilty to similar charges." The defendants now focus their argument on the fact that the government ignored the district court's admonition to use the term "robbery" sparingly and contend that the government's overuse of the term resulted in the prejudicial suggestion that Taylor and Hersl, like the testifying coconspirators, committed robbery.

First, we agree with the government that the coconspirators' use of the term "robbery" did not state an opinion about whether Taylor and Hersl had committed robbery, but rather expressed their knowledge of their own guilty pleas. Each pleaded guilty to a RICO conspiracy in which robbery was a predicate act, and their description of the predicate acts of robbing victims was an accurate description of their plea. Moreover, the defendants apparently recognized this as they attempted to clarify the issue in questioning coconspirator Hendrix, establishing that Hendrix pleaded guilty to RICO conspiracy and not to any individual robbery.

More importantly, however, we find that the district court's repeated instructions to the jury — telling them to draw no inferences about the defendants' guilt from the coconspirators' characterization of their own pleas — substantially mitigated any potential confusion. As the district court recognized, scenarios concerning conspiracy charges where one conspirator pleads guilty and testifies against another are fairly common. And in those cases, numerous courts have determined that a cautionary instruction is sufficient to ensure that the jury considers coconspirators' guilty pleas within the properly limited scope and does not confuse any testifying witnesses' guilt with that of the defendant. *See, e.g.*, *United States v. Woods*, 764 F.3d 1242, 1246–47 (10th Cir. 2014); *United States v.*

23

*Benson*, 591 F.3d 491, 498–99 (6th Cir. 2010); *United States v. DeLoach*, 34 F.3d 1001, 1005 (11th Cir. 1994); *United States v. Willis*, 997 F.2d 407, 414–15 (8th Cir. 1993).

To be sure, there were occasions during trial when the government used the term "robbery" unprompted by a coconspirator's use of the term. But we conclude that those limited occasions, accompanied by the court's repeated instructions to the jury, did not affect the outcome of the trial. *See United States v. Brooks*, 111 F.3d 365, 371 (4th Cir. 1997) (noting that "to find a district court's error harmless, we need only be able to say with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error" (cleaned up)).

## B

The defendants also contend that the district court abused its discretion in denying their motion for a mistrial after an outburst by government witness Ronald Hamilton, the alleged victim of the Hobbs Act robbery charged in Count V. They argue that Hamilton's outburst was prejudicial because, despite the court's curative instruction, the jury could not thereafter reach verdicts unaffected by the outburst's emotional impact.

The outburst occurred when Taylor's counsel was cross-examining Hamilton, as follows:

Q. Well, what are your mortgage —

A. Check the record.

Q. What are your mortgage payments?

A. Does that makes a difference? What's — this right here destroyed my whole f--kin' family.

24

Sorry. Sorry, Your Honor.

Court: It's all right.

Witness: This destroyed my whole family. I am in a divorce process right now because of this bullshit. This destroyed my whole f--kin' family, man. You sit here asking me questions about a f--kin' house. My f--kin' wife stays in the f--kin' Walmart every f--kin' night until I come home. If you want to know that, worry about that. That's what the f--k's the matter in here, man. Everybody's life is destroyed, man. My house don't have nothing to do with this. The problem is my wife is taking medication 'cause of this.

Court: Sir, sir —

Witness: Man — I'm sorry, Your Honor. I'm sorry to the courts. But the fact of the matter is, man, my house don't have nothing to do with this.

The fact of the matter is, came in my house, destroyed my family. I'm in a divorce process because of this. Because of this. This has put so much financial pressure on my family. Kids, man, are scared to go in the house because of this.

The next morning, Hersl moved for a mistrial based on the outburst, and Taylor joined. While the district court denied the motion, it struck the testimony from the record and instructed the jury that the outburst was "not responsive to any specific question" and was not to be considered as evidence.

The defendants now contend that the court's response was inadequate and therefore amounted to an abuse of discretion because the outburst created an unacceptable risk that the jury would convict Hersl and Taylor out of of sympathy for Hamilton or outrage at the harm that he and his family had suffered.

It is important to recognize that on a courtroom issue such as this, the district court is best positioned to assess whether a mistrial is warranted or whether other means exist to address the issue adequately. *See Burfoot*, 899 F.3d at 341. A court nonetheless abuses its discretion if the defendant shows actual prejudice, but we have held that there is no prejudice if we determine that the jury, despite the incident in question, was able to "make individual guilt determinations by following the court's cautionary instructions." *United States v. Wallace*, 515 F.3d 327, 330 (4th Cir. 2008) (quoting *United States v. Dorsey*, 45 F.3d 809, 817 (4th Cir. 1995)). Because a mistrial is so drastic a step, we will disturb the district court's refusal to grant one only in extraordinary circumstances, such as when evidence is admitted that would prejudice the defendant, and there is an "overwhelming probability" that the jury would be unable to heed a curative instruction to ignore it. *See Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987) (citing *Richardson v. Marsh*, 481 U.S. 200, 208 (1987)).

In this case, Hamilton's outburst was indeed emotional and disrupting — he was obviously upset to have been robbed by rogue police officers. But it is well to recognize that his outburst was not necessarily directed at Taylor or Hersl nor did it directly pertain to any issue committed to the jury about their guilt. *Cf. United States v. Schiff*, 612 F.2d 73, 80–82 (2d Cir. 1979) (the defendant was prejudiced where the evidence at issue dealt precisely with a question that would be before the jury). Indeed, when testifying about the robbery, Hamilton spoke mostly about the corrupt acts of Sgt. Jenkins, and he only occasionally referred to Hersl. And, by all accounts, Taylor was not part of this particular encounter. Moreover, other coconspirators testified unequivocally that they had robbed

26

the Hamiltons. Hamilton's outburst expressed his emotional reaction to this event, but he said nothing inflammatory about Taylor and Hersl's involvement.

Other factors also indicate that Hamilton's outburst did not prejudice the defendants. For instance, the jury, despite the outburst, made individual guilt determinations, as evidenced by the fact that it did not convict the defendants on all counts. *See Dorsey*, 45 F.3d at 817 (recognizing that a jury's willingness to acquit a defendant on some counts is "strong evidence that the district court's denial of his motion for mistrial did not result in the type of prejudice that warrants reversal"). In addition, Hamilton's outburst was not instigated by the government but occurred during cross-examination by Taylor's counsel. *See id.* (observing that the likelihood of prejudice is diminished where a statement is not purposefully introduced by the government); *cf. United States v. Murray*, 784 F.2d 188, 188 (6th Cir. 1986) (concluding that error in referring to a polygraph examination was not harmless in part because the reference was "introduced deliberately by an experienced FBI agent").

For all these reasons, we conclude that the district court did not abuse its discretion in denying the motion for a mistrial and opting, instead, to strike the testimony and give the jury a curative instruction.

C

Taylor contends that the district court abused its discretion in denying his motion to dismiss the indictment or, in the alternative, to continue the trial for three months, due to pretrial publicity. In support of this motion, he argues that the news coverage of the case

27

was both pervasive — being covered extensively on television, on radio, and in newspapers — and prejudicial. To underscore his point, he attached to his motion three articles from the Baltimore Sun. He claims that in denying the motion, the court denied him his Sixth Amendment right to a fair trial — *i.e.*, his right to a trial by an "impartial jury." U.S. Const. amend. VI; *see also Skilling v. United States*, 561 U.S. 358, 377 (2010).

Following the analytical framework set forth in *Skilling*, we conclude that the pretrial publicity neither created a *presumption* of prejudice nor caused *actual* prejudice.

First, we note that "juror *impartiality* . . . does not require *ignorance*," *Skilling*, 561 U.S. at 381, and juror exposure to media coverage cannot by itself establish that a defendant was deprived of a fair trial, even if the publicity was pervasive, adverse, and voluminous, *id.* at 384; *see also United States v. Bakker*, 925 F.2d 728, 732 (4th Cir. 1991).

Under the *Skilling* framework, we consider first whether pretrial publicity was so extreme as to give rise to a presumption of prejudice. *Skilling*, 561 U.S. at 379–81. A review of the newspaper articles attached to Taylor's motion, however, reveals that they were predominantly factual and did not present the type of "vivid, unforgettable information" that warrants a presumption of prejudice. *Id.* at 384; *see also Bakker*, 925 F.2d at 732 (reasoning that "unemotional, factual reports of legal proceedings" weigh against a presumption of prejudice). Nor did the articles contain, for instance, "inflammatory" information that "depicted [Taylor] as an evil man," as did the article that we found prejudicial in *United States v. Gray*, 788 F.2d 1031, 1033 (4th Cir. 1986). Indeed, only one of the three articles attached to Taylor's motion mentioned Taylor by name, and

28

then it merely stated: "Two other officers — Detectives Daniel Hersl and Marcus Taylor — are slated to fight the charges at a trial beginning Jan. 22."

In assessing whether there is a presumption of prejudice, we also take into account the size of Baltimore's population, which was approximately 621,000 residents. That is large enough to reduce the likelihood of prejudice. *See Skilling*, 561 U.S. at 382 (noting that there is a "reduced likelihood of prejudice where venire was drawn from a pool of over 600,000 individuals") (citing *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1044 (1991) (plurality opinion))). Finally, the fact that the jury acquitted Taylor on one count belies any overarching prejudice. *Id.* at 383–84 (citing *United States v. Arzola-Amaya*, 867 F.2d 1504, 1514 (5th Cir. 1989) ("The jury's ability to discern a failure of proof of guilt of some of the alleged crimes indicates a fair minded consideration of the issues")).

The factual basis for Taylor's motion is weaker than that considered in *Skilling*. Yet even in *Skilling*, the Supreme Court held that the widespread negative coverage about Enron's bankruptcy did not create a presumption that a former Enron executive charged with securities fraud could not receive a fair trial in Houston. 561 U.S. at 385. The Court found that the tenor of the news coverage was not highly prejudicial to the defendant, and any potential for prejudice was diluted by Houston's size and diversity. *Id.* at 382–84.

That brings us to the second inquiry under the *Skilling* framework, the question of whether Taylor demonstrated *actual* prejudice. The evidence to support such a showing was meager and inadequate. During voir dire, the district court asked potential jurors whether they had read or heard anything about the case or the defendants. Only one member of the venire who responded affirmatively to this question was ultimately seated

29

on the jury. That juror indicated that he or she had heard some information about the case on talk radio, but the juror could not recall specifics and stated that the news coverage would not affect his or her ability to decide the case based on the evidence presented. This evidence is clearly insufficient to show that Taylor was deprived of his Sixth Amendment right to an impartial jury.

For the foregoing reasons, we conclude that the district court did not abuse its discretion in denying Taylor's motion.

D

Finally, the defendants contend that the district court erred in denying their motion for a new trial, which they filed three months after the jury's verdicts when they discovered new evidence that would have allowed them to impeach a government witness, Antonio Santiful, at trial. They argue that the government knew during trial that Santiful was under investigation for drug trafficking but failed to disclose that fact, in violation of *Brady v. Maryland*, 373 U.S. 83 (1963) and *Giglio v. United States*, 405 U.S. 150, 153–54 (1972) (applying *Brady* to impeachment evidence).

The defendants learned three months after the jury's verdicts in this case — which were returned on February 12, 2018 — that on May 8, 2018, a grand jury had returned an indictment against Santiful, charging him with participation in two drug transactions in March 2018 which it alleged were part of a larger conspiracy dating back to November 2017. In other words, while the two drug transactions occurred after the verdicts were returned in this case, the conspiracy was alleged to have begun well before Santiful testified

30

in this case. On this basis, the defendants conclude that Santiful must have been under investigation at the time he was testifying against them, a fact that they could have used to impeach his testimony had the government disclosed it.

But from the record developed after the defendants filed their motions, there is little evidence to support their claims. The record shows that on February 1, 2018 (before the February 12 verdicts in this case), a pole camera recorded Santiful in possession of a firearm. Officers of the Bureau of Alcohol, Tobacco, Firearms, and Explosives ("ATF"), a law enforcement agency that was not involved in the prosecution of the GTTF officers, prepared a report dated February 8 that identified Santiful in the footage and noted that his status as a convicted felon prohibited him from possessing a firearm. That report was given to the U.S. Attorney's Office on February 13, one day *after* the verdicts were returned here. The defendants presented no evidence that the government took any other steps to investigate Santiful prior to the jury verdicts in this case.

The district court found that during the trial, no U.S. prosecutor had knowledge of the pole camera data or any other investigation of Santiful. Specifically, the court stated:

> I am not aware of anything relating to a prosecutor's duty to disclose that would have required in some way the ATF or a supervisor to recognize the significance of this as to Mr. Santiful and somehow get it to the prosecutors before this trial is over. And, in any event, they didn't. There's just no indication of that whatsoever.

The court did recognize that the information could have been used to help impeach Santiful, but it concluded that the evidence was not material because it would have provided only "minimally additional impeachment." The court noted that evidence had been introduced at trial of at least two prior felony convictions — one for the illegal possession of a firearm

31

and a second for the illegal possession of drugs.  In light of this evidence, the court found no reasonable probability that the additional impeachment evidence would have changed the outcome in this case.  The court accordingly denied the defendants' motion for a new trial.

The defendants now contend that "evidence that Santiful was a current, not merely a former, drug dealer would have been extremely significant [in] cross-examining him." "Such evidence," they maintain, could have "produced a different trial result."

The Supreme Court's decision in *Brady* establishes that the prosecution's "suppression . . . of evidence favorable to an accused" violates due process.  373 U.S. at 87.  To demonstrate a *Brady* violation, "the proponent must show that the undisclosed evidence was (1) favorable to him either because it is exculpatory, or because it is impeaching; (2) material to the defense, i.e., prejudice must have ensued; and (3) that the prosecution had materials and failed to disclose them."  *United States v. Wolf*, 860 F.3d 175, 189–90 (4th Cir. 2017) (cleaned up); *see also Giglio*, 405 U.S. at 153–54.

To satisfy the *Brady* requirements, the defendants argue in particular that the district court erred in concluding (1) that the prosecution did not possess the information at the time of trial and (2) that the disclosure would not have created "a 'reasonable probability' of a different result."  *Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (holding that such a reasonable probability is shown "when the government's evidentiary suppression undermines confidence in the outcome of the trial" (cleaned up)).

On their first point, the defendants argue that even though the specific prosecutors in this case did not possess the information about Santiful, the district court should have

32

imputed to the prosecutors knowledge of an investigation of one of their witnesses by other prosecutors in the same U.S. Attorney's Office. But this argument gains them little. Based on the timeline found by the district court, "there were not any . . . Government prosecutors that would have known this new information" before the verdicts were returned on February 12, 2018, leaving nothing to impute to the specific prosecutors in this case. The court found that ATF agents prepared a report regarding the pole camera data on February 8, which was submitted to the U.S. Attorney's Office *on February 13*, and no government prosecutor, therefore, received information about Santiful until the day after the jury's verdicts. The defendants have not offered any evidence to suggest that the district court's factual findings on this timeline were clearly erroneous.

We also conclude that the knowledge of the ATF officers investigating Santiful should not be imputed to the prosecutors in this case. To be sure, the Supreme Court has made clear that the *Brady* disclosure requirement covers material "known only to police investigators and not to the prosecutor[s]." *Kyles*, 514 U.S. at 438; *see also United States v. Robinson*, 627 F.3d 941, 951 (4th Cir. 2010) ("*Brady*'s commands do not stop at the prosecutor's door; the knowledge of some of those who are part of the investigative team is imputed to prosecutors regardless of prosecutors' actual awareness"). But this principle is not boundless. Specifically, *Kyles* recognized that "the individual prosecutor has a duty to learn of any favorable evidence *known to the others acting on the government's behalf in the case*, including the police." 514 U.S. at 437 (emphasis added).

Thus, *Brady*'s command is not so broad as to reach the circumstances of this case. Here, the ATF officers investigating Santiful were not part of the GTTF "investigative

33

team," which was made up of FBI officers; the ATF officers were looking into an entirely separate case related to the Straight Kash Cartel. Imputing their knowledge to the prosecutors in this case would require us to stretch *Brady* beyond its scope and would effectively impose a duty on prosecutors to learn of any favorable evidence known by *any* government agent. *Cf. Fullwood v. Lee*, 290 F.3d 663, 685 n.12 (4th Cir. 2002) (imputing to prosecutors knowledge of the defendant's private conversation with a police officer *working the same case*); *United States v. Sutton*, 542 F.2d 1239, 1241 n.2 (4th Cir. 1976) (imputing to federal prosecutors the knowledge and actions of an FBI agent *working the same case*); *Boone v. Paderick*, 541 F.2d 447, 451 (4th Cir. 1976) (imputing to prosecutors a promise made by state police *working the same case*); *Barbee v. Warden, Md. Penitentiary*, 331 F.2d 842, 846 (4th Cir. 1964) (imputing to state prosecutors the knowledge of Baltimore City Police officers *working the same case*). We thus conclude that the district court did not err in finding that the prosecutors in this case did not have actual or constructive knowledge of the information at the time of trial.

The defendants also challenge the district court's ruling that the new evidence was not material. But we find it hard to imagine how information that Santiful was *under investigation* for drug offenses would have been consequential to his credibility in the jury's eyes given that the defense had impeached him with evidence of his two prior firearms convictions and evidence of his prior drug conviction had also been introduced. Evidence of the investigation would have been only cumulative — and then only slightly so. Accordingly, information that Santiful may have been under investigation at the time of the trial does not undermine our confidence in the trial's outcome and was therefore not

34

material. This is especially so because the evidence was not of the type that could have resulted in acquittal. *See Wolf*, 860 F.3d at 189. Santiful's testimony was limited to "the Santiful incident," which was only one of 22 predicate racketeering acts charged under Count II, and the jury needed to find only 2 to convict.

We therefore affirm the district court's ruling denying the defendants' motion for a new trial.

VI

Finally, Taylor and Hersl contend that their 216-month sentences are substantively unreasonable due to their increased vulnerability as incarcerated police officers and other factors specific to each defendant.

The district court calculated the Sentencing Guidelines range for each defendant, using an offense level 37 and criminal history category I, to arrive at an advisory sentencing range of 210 to 262 months' imprisonment. After "plac[ing] on the record an individualized assessment based on the particular facts of the case before it" for each defendant, *United States v. Lynn*, 592 F.3d 572, 576 (4th Cir. 2010) (cleaned up), the court sentenced each defendant to 216 months' imprisonment, near the low end of the advisory sentencing range.

It is well established that we review sentences on appeal by following a two-step process. First, we ensure that the "district court committed no significant procedural error" in determining the sentence. *Lynn*, 592 F.3d at 575 (quoting *Gall v. United States*, 552 U.S. 38, 51 (2007)). Although the defendants do not contend that the sentences were

procedurally unreasonable, we nonetheless have reviewed the record and find no procedural error.

Second, we consider the substantive reasonableness of the sentence under an abuse of discretion standard. *Lynn*, 592 F.3d at 575. On appeal, a sentence within the properly calculated Guidelines range is "presumptively reasonable." *United States v. White*, 850 F.3d 667, 674 (4th Cir. 2017).

The defendants direct us to *Koon v. United States*, 518 U.S. 81 (1996), for the proposition that a downward departure is warranted in circumstances such as these. *Koon* arose from the police beating of Rodney King and in the context of the Los Angeles riots that erupted in its aftermath. In considering the police officers' sentences, the Supreme Court observed that a district court does not necessarily abuse its discretion in granting a downward departure for a truly "unusual" case that elicited "widespread publicity and emotional outrage" and where defendant officers would be likely targets of abuse in prison. *Id.* at 112. But while the Court concluded that a downward departure might be permissible in such circumstances, it did not hold that the failure to grant such a departure would be an abuse of discretion; such a decision remains fully within the discretion of the district court. Although Hersl and Taylor's case did indeed strike a public nerve, the public response and the likelihood of the defendants' becoming targets while in prison cannot fairly be compared to the *Koon* situation, where the aftermath of the officers' conduct involved over 40 deaths and 2,000 injuries. *See id.* at 88.

We conclude that the district court did not abuse its discretion in declining to grant the defendants a downward departure, and we uphold the defendants' sentences as substantively reasonable.

## VII

This is a particularly sad case. The community places a noble trust in police officers to define and enforce, in the first instance, the delicate line between the chaos of lawlessness and the order of the rule of law. And when police officers breach that trust and misuse their authority, as here, a measure of despair infuses in the community, tainting far more than do similar crimes by others. The officers' convictions and sentences in this case are just and necessary, and we can only hope for a renewed commitment to the trust that we place in police officers who discharge their duties well.

The judgments of the district court are affirmed.

AFFIRMED

BARBARA MILANO KEENAN, Circuit Judge:

I concur in the majority opinion with one exception. Although I agree with my colleagues' rejection of the defendants' challenge under *Brady v. Maryland*, 373 U.S. 83 (1963), I would rely exclusively on the fact that the impeachment information was not material to the jury's decision. *Id.* at 87. As the majority aptly explains, the jury already received strong impeachment evidence regarding Santiful's prior drug and firearm convictions, reducing the likelihood that evidence of another investigation into similar conduct would affect the jury's assessment of Santiful's credibility. *See United States v. Bartko*, 728 F.3d 327, 338-39 (4th Cir. 2013) (withheld evidence not material if cumulative of other impeachment information); *see also United States v. Parker*, 790 F.3d 550, 558 (4th Cir. 2015) (same).

Because we can dispose of the *Brady* issue on materiality grounds, I would not address the closer question whether the investigators' knowledge of the impeachment material can be imputed to the prosecutors in this case. I therefore do not join the majority's broad conclusion that imputing such knowledge "would effectively impose a duty on prosecutors to learn of any favorable evidence known by *any* government agent." Maj. Op. at 34.