*Marco Darrin Lomax v. State of Maryland*, No. 1857, Sept. Term 2021.  Opinion by
Arthur, J.

**UNIFORM POSTCONVICTION PROCEDURE ACT—SUBPOENA FOR
EVIDENCE IN A POSTCONVICTION PROCEEDING**

In a post-conviction proceeding, Maryland Rule 4-265(b)(1) allows either party,
including the petitioner, to issue subpoenas "commanding a witness to appear to testify"
at the post-conviction hearing and "designat[ing] the relevant documents, recordings,
photographs, or other things, not privileged, that are to be produced by the witness."

In this case, the petitioner was convicted in part because of the testimony of a police
officer who was himself later convicted of federal racketeering charges for his role in the
"Gun Trace Task Force."  In a post-conviction proceeding, the petitioner issued a
subpoena to an Assistant State's Attorney, requesting, among other things, the production
of "*Brady* material" and Baltimore City Police Department Internal Affairs records that
existed at the time of trial.  On the State's motion, the trial court quashed the subpoena on
the ground that a petitioner could not subpoena what the State "should have" produced at
trial.

The Appellate Court of Maryland reversed the judgment in part.  A person who has been
convicted and is either confined or on parole or probation may commence a post-
conviction proceeding to establish that the State secured the conviction without
complying with its disclosure obligations under *Brady v. Maryland*, 373 U.S. 83 (1963).
When a post-conviction petitioner adequately alleges that the State secured a conviction
without complying with its obligations under *Brady*, the petitioner may issue a subpoena
requiring a State witness to produce the materials that *Brady* obligated the State to
disclose before the conviction was obtained.  Any other conclusion would tend to insulate
an unconstitutional conviction from collateral attack and would reward the State for
violating a petitioner's right to due process of law.

An adequate allegation requires more than a conclusory allegation or an assertion of law;
it entails a clear statement of the facts necessary to establish a likely *Brady* violation.
Petitioner adequately alleged that the State secured his conviction without complying
with its *Brady* obligations.

**CRIMINAL LAW—INSPECTION OF CONFIDENTIAL RECORDS**

Petitioner served an Assistant State's Attorney with a subpoena requiring her to appear at
a post-conviction hearing and to produce *Brady* material, including Internal Affairs
("IAD") records for three Baltimore City police officers.  At the time of the subpoena,
section 4-311 of the General Provisions Article ("GP") of the Maryland Code (2014,
2019 Repl. Vol.), required a custodian to deny a request for the inspection of IAD records

because they were considered to be "personnel records." Under the governing law at the time of the petitioner's trial and at the time of the hearing on his post-conviction petition, a criminal defendant could obtain IAD records only by demonstrating a "need to inspect" the records and persuading the court, after an in-camera review, that they might reveal or lead to admissible evidence. The court quashed the subpoena for the IAD records.

The Appellate Court of Maryland held that the court did not err in quashing that aspect of the subpoena. At the time of the hearing on the post-conviction petition, persons facing criminal charges might gain access to otherwise confidential IAD records in order to exercise their confrontation and due process rights. But because a person who has been convicted of a crime does not have the same confrontation and due process rights as a person who is merely facing criminal charges, the protection for IAD records, should, if anything, have been greater in a post-conviction case than in a criminal case.

GP § 4-311 was amended, effective October 1, 2021, to state that, in general, "a record relating to an administrative or criminal investigation of misconduct by a police officer, including an internal affairs investigatory record, a hearing record, and records relating to a disciplinary decision, is not a personnel record for purposes" of the statute. At present, therefore, a custodian may, but need not, deny a request for the inspection of IAD records. In view of the change of law, the court, on remand, may permit the petitioner to issue another subpoena for the IAD records.

## UNIFORM POSTCONVICTION PROCEDURE ACT—INEFFECTIVE ASSISTANCE OF COUNSEL

Under section 7-102(b) of the Criminal Procedure Article ("CP") of the Maryland Code (2001, 2018 Repl. Vol.), a petition for post-conviction relief may be pursued only if "the alleged error has not been previously and finally litigated or waived in the proceeding resulting in the conviction or in any other proceeding that [he] has taken to secure relief from [his] conviction." Under CP § 7-106(b)(1)(i)(3), "an allegation of error is waived when a petitioner could have made but intelligently and knowingly failed to make the allegation . . . on direct appeal[.]"

In this case, the petitioner attempted to raise the issue of ineffective assistance of counsel because his trial counsel made the decision not to present surveillance footage from the scene of the crime at his trial, because trial counsel failed to highlight exculpatory information in the victim's medical records, and because trial counsel failed to object to the State's contrary interpretation of the medical records in closing.

Petitioner had previously raised the issue about surveillance footage in a motion for a new trial. Petitioner contended that his trial counsel was ineffective because he did not employ the video; the trial court rejected that contention; and petitioner failed to challenge the ruling on direct appeal. Therefore, he has waived the contention. But, even

if he had not waived the contention, the Appellate Court of Maryland found no error, because the record reflects that trial counsel made a reasonable, strategic decision not to use the video which the trial court described as "a visually poor piece of evidence."

The Appellate Court of Maryland also found no error in counsel's decision not to use the ambiguous medical records or in failing to object to the State's interpretation of the medical records, because the evidence could support multiple interpretations.

Circuit Court for Baltimore City
Case Nos. 111025040-42

REPORTED

IN THE APPELLATE COURT

OF MARYLAND*

No. 1857

September Term, 2021

_____

MARCO DARRIN LOMAX

v.

STATE OF MARYLAND

_____

Kehoe,
Berger,
Arthur,

JJ.

_____

Opinion by Arthur, J.

_____

Filed: July 26, 2023

Pursuant to the Maryland Uniform Electronic Legal Materials
Act (§§ 10-1601 et seq. of the State Government Article) this
document is authentic.



Gregory Hilton, Clerk

* At the November 8, 2022, general election, the voters of Maryland ratified a
constitutional amendment changing the name of the Court of Special Appeals of
Maryland to the Appellate Court of Maryland.  The name change took effect on
December 14, 2022.

In 2013, appellant Marco Darrin Lomax was convicted of attempted murder, largely on the basis of the testimony of three Baltimore City police officers. One of those officers was Detective Daniel Hersl, who was later convicted of racketeering, robbery, and other federal offenses as a result of his role in the infamous Gun Trace Task Force or "GTTF."

In a post-conviction proceeding in 2021, Lomax claimed, among other things, that the State had withheld exculpatory information in violation of *Brady v. Maryland*, 373 U.S. 83 (1963). In an effort to establish that claim, Lomax served an Assistant State's Attorney with a subpoena commanding her to produce "*Brady* material," including Internal Affairs files for Hersl and the other officers who testified at Lomax's trial, from the date of the offense through the date of the subpoena.

On the State's motion, the Circuit Court for Baltimore City quashed the subpoena. The court reasoned that a post-conviction petitioner has no right to "discovery" and that a subpoena could not compel the State to provide "something that should have been provided" at the petitioner's criminal trial. The court later denied Lomax's petition for post-conviction relief, which included his *Brady* claim and two unrelated claims alleging ineffective assistance of counsel.

We granted Lomax's application for leave to appeal. For the reasons discussed below, we reverse in part. We hold that, when a post-conviction petitioner makes a well-founded assertion that the State violated its *Brady* obligations, the petitioner may use a subpoena to compel the State to produce the exculpatory information that it was obligated to produce at trial.

FACTUAL AND PROCEDURAL BACKGROUND

## The Evidence at Trial

### *Testimony of Detective Daniel Hersl*

At Lomax's criminal trial, Hersl testified that on January 6, 2011, at approximately 7:30 p.m., he and Detective John Burns, Detective Howard Ilgenfritz, and one other officer were working in a plainclothes capacity on patrol, in an unmarked police car, on Harford Road in Baltimore City. While driving by a carry-out restaurant in the 2300 block, Hersl noticed 10 to 15 people standing around out front. Hersl slowed down. As he passed by, he observed a tall person with long braids, wearing a black mask and leather jacket, approach a man and shoot him multiple times. According to Hersl, the person fired four to five gunshots from a silver gun.

Once the gunfire stopped, Detective Ilgenfritz, the front-seat passenger, got out of the unmarked cruiser and ran towards the front of the store. Hersl drove the cruiser in a "circle around the block" to provide backup for Ilgenfritz.

As Hersl pulled up to the intersection of Sherwood Avenue and Cliftview Avenue, he looked to his left and saw Detective Ilgenfritz running down the middle of the street, pointing at a silver Nissan speeding away down Cliftview Avenue. Hersl followed the Nissan, based on what he called his "police intuition" that Ilgenfritz's gesture meant that the shooter was in that vehicle.

Hersl chased the Nissan at a high rate of speed in a series of turns through the neighborhood and was, in his words, "at least two small city blocks behind them." Hersl lost sight of the Nissan at one point, but later observed what he called an "identical" car

parked on the 600 block of Gutman Avenue. Hersl admitted that he could not definitively identify the parked car as the same as the one that he had pursued because he never got close enough to read the license plate or see how many people were in the vehicle. Still, citing his "police intuition through training and experience," he insisted that he "knew" and had "no doubt" the two were the same.

Hersl observed two men, whom he identified as Lomax and Ravanna Cornish, get out of the Nissan. Lomax threw a silver object underneath the car. Lomax and Cornish both ran from the scene, and Lomax threw a black object with his right hand. Further along, Cornish threw down a set of keys. Following a foot chase, Lomax was arrested without resistance. Cornish was detained a few blocks away.

Once Lomax was in custody, Hersl returned to the parked car. He found a silver handgun underneath the car and a black ski mask nearby. The handgun was a six-shot, .357 revolver, containing three live cartridges and three spent cases.

### Testimony of Detective Howard Ilgenfritz

Detective Ilgenfritz was in the front seat of Hersl's unmarked car at the time of the shooting. He saw several people standing in front of the carry-out restaurant, as well as several people scattering from the area. He heard four to five gunshots and then got out of the car. He ran to the scene and saw two men sprinting away towards Cliftview Avenue. One man was of average height, had a heavy build, and wore a tan jacket and blue jeans. The other was very tall, had a thin build, and wore a black ski mask, a black jacket, and blue jeans.

3

Detective Ilgenfritz ran after the men and saw them get into a silver, four-door Nissan. The Nissan pulled away, and Ilgenfritz continued to run after the vehicle. Ilgenfritz saw Hersl in his unmarked cruiser and pointed out the Nissan for Hersl to follow. After Lomax and Cornish had been detained, Ilgenfritz identified the Nissan as the one he saw the men enter while he was chasing them.

### Testimony of Detective John Burns

Detective Burns was seated in the rear driver's-side seat of Hersl's unmarked police cruiser at the time of the shooting. As he was observing a large group of people lingering outside of the carryout restaurant, Detective Burns saw the shooter discharge a silver firearm at the victim, who collapsed on the sidewalk. He identified the shooter as a tall male with long braids, wearing a black mask and a black jacket. Burns saw the shooter and another man flee from the scene, running southbound on Harford Road towards Cliftview Avenue. Burns ran to the scene of the shooting to render aid to the victim, Alonzo Tunnell.

### Testimony of Alonzo Tunnell

Alonzo Tunnell testified that he was shot six times, in his neck, left leg, left shoulder, right shoulder, and right buttocks. Tunnell also testified that he did not see who shot him, nor did he see a gun or anyone with a gun. However, he did acknowledge that he told detectives during an interview that he had seen someone with a mask and a gun.

### Testimony of Devante Monroe

Devante Monroe was with Tunnell before the shooting and when he was shot. At trial, Monroe testified that he did not see the shooter or remember any other details of the

crime. However, in a recorded statement taken on the day after the shooting, Monroe told investigators that he and Tunnell were walking to the store together when he noticed a Black male in a black ski mask coming from Cliftview Avenue. He said that the man was wearing a black hoodie and carrying a silver revolver with a brown handle in his right hand. Upon seeing the man, Monroe yelled, "Yo, he got a gun," and took off running. He heard approximately five gunshots. Once the gunfire ceased, Monroe looked back over his shoulder and saw the shooter run down Cliftview Avenue.

### *The Physical Evidence*

Investigators found Lomax's fingerprints on the silver Nissan and on items inside that vehicle. Investigators also found DNA consistent with Lomax's on the vehicle, the .357 revolver, and the ski mask. A firearms examiner testified that the three cartridge cases found in the .357 revolver were fired from that weapon, but she could not offer any information about when or where the weapon had been fired. Lomax's hands were tested for gunshot residue after the shooting, and the results were negative.

### **Jury Findings and Sentencing**

On May 24, 2013, after a seven-day trial, a jury found Lomax guilty of six criminal offenses related to the shooting of Tunnell: (1) attempted first-degree murder; (2) use of a handgun in the commission of a crime of violence; (3) possession of a firearm after having been convicted of a disqualifying crime; (4) unlawfully wearing, carrying, or transporting a handgun; (5) conspiracy to commit first-degree murder; and (6) conspiracy to use a handgun in the commission of a crime of violence. The court

subsequently granted Lomax's motion to vacate the conspiracy convictions, because his co-defendant had been acquitted of the conspiracy charges.

Lomax, through new counsel, filed a motion for a new trial. At a hearing on the motion, Lomax presented video footage taken from a surveillance camera outside the entrance to a liquor store, located at the corner of Cliftview Avenue and Harford Road, near the scene of the shooting. Lomax argued that his trial attorney was ineffective in that he failed to inform him of the existence of the video until after his conviction. On July 31, 2014, the court denied Lomax's motion for new trial.

On December 1, 2014, Lomax was sentenced to 25 years' incarceration. He filed an appeal, but did not pursue it.

**Hersl and the GTTF**

In February 2017, a federal grand jury indicted Hersl and six other Baltimore City police officers "for their participation in a racketeering conspiracy and substantive acts of racketeering, in violation of the Racketeer Influenced and Corrupt Organizations Act ('RICO'), 18 U.S.C. § 1962, as well as other related crimes." *United States v. Taylor & Hersl*, 942 F.3d 205, 210 (4th Cir. 2019). These officers, who were members of the GTTF, "were charged with robbing citizens during the course of their police service, taking money, jewelry, and other items." *Id.* "They were also charged with committing fraud in obtaining overtime pay from the Police Department." *Id.* Five of the seven officers pleaded guilty. *Id.* Hersl and another officer "went to trial and were convicted of RICO conspiracy, in violation of 18 U.S.C. § 1962(d); substantive acts of RICO, in

6

violation of 18 U.S.C. § 1962(c); and Hobbs Act robbery, in violation of 18 U.S.C. § 1951." *Id.*[1]

The GTTF scandal came on the heels of a Justice Department report, which found reasonable cause to believe that the Baltimore City Police Department had engaged in a pattern or practice of conduct that violated the First and Fourth Amendments of the United States Constitution, as well as federal anti-discrimination laws. U.S. Dep't of Justice, Civil Rights Div., *Investigation of the Baltimore City Police Department* (Aug. 10, 2016), https://perma.cc/MN5A-DWV8. The Justice Department report led to a federal consent decree, which remains in place today.

The GTTF scandal engendered an enormous amount of publicity, including two books[2] and an HBO miniseries based on one of the books.[3]

In addition to the publicity surrounding the GTTF as a unit, many news articles were published about Hersl's own wrongdoing. They include: Justin Fenton, *Baltimore Man Served Time for Having Gun He Says was Planted by A Corrupt City Police Officer. Now He Wants His Record Cleared*, Baltimore Sun (June 29, 2018); Justin Fenton, *FBI had Recording Device in Police Car when Baltimore Gun Unit Fled Scene of Crash After Chase*, Baltimore Sun (Jan. 30, 2018); Justin Fenton, *Rapper Young Moose sues*

---

[1] Detectives Burns and Ilgenfritz were not members of the GTTF and were not charged with or convicted of any crimes.

[2] Justin Fenton, *We Own this City: A True Story of Crime, Cops, and Corruption* (Random House 2021); Baynard Woods & Brandon Soderberg, *I Got a Monster: The Rise and Fall of America's Most Corrupt Police Squad* (St. Martin's Press 2020).

[3] *We Own This City* (HBO television broadcast 2022).

*convicted Gun Trace Task Force officer Hersl, others*, Baltimore Sun (Mar. 10, 2021). At least one article predates the GTTF scandal: Mark Puente, *Some Baltimore Police Officers Face Repeated Misconduct Lawsuits*, Baltimore Sun (Oct. 4, 2014).

In a report dated January 19, 2021, the American Civil Liberties Union revealed that Hersl had received 130 internal affairs or "IAD" complaints between 2015 and 2019. American Civil Liberties Union of Maryland, *Chasing Justice: Addressing Police Violence and Corruption in Maryland*, at 19 (Jan. 19, 2021), https://perma.cc/GFG9-EK4D. According to the report, multiple complaints were "sustained" (i.e., found to be valid). *Id.* at 20.

Meanwhile, in October of 2019, the Commissioner of the Baltimore City Police Department and the Baltimore City Solicitor commissioned an independent investigation of the systemic and structural issues that contributed to the GTTF scandal. Judge James K. Bredar, the United States District Judge who is supervising the consent decree between Baltimore City and the Department of Justice, approved the independent investigation. The investigation was conducted by Michael Bromwich of Steptoe & Johnson, a former federal prosecutor and former Inspector General for the Department of Justice. Bromwich issued his report on January 13, 2022. Steptoe Investigative Team, *Anatomy of the Gun Trace Task Force Scandal: Its Origins, Causes, and Consequences* (Jan. 2022), https://perma.cc/FP4N-D6GM (the "Bromwich Report"). The report revealed that the scope of the corruption was widespread, and that the Baltimore City Police Department has historically fallen short in creating and maintaining a culture of lawful and ethical behavior.

**The Post-Conviction Petitions and Subpoena for IAD Records**

In 2017, Lomax, representing himself, filed a petition and a supplemental petition for post-conviction relief under the Uniform Postconviction Procedure Act ("UPPA"), Maryland Code (2001, 2008 Repl. Vol., 2016 Supp.), §§ 7-101 to -301 of the Criminal Procedure Article ("CP").  In July 2017, Lomax retained counsel, who moved to postpone the post-conviction hearing, in part to investigate Hersl's background and activities.  In November 2017, counsel obtained the court's permission to withdraw Lomax's petitions, without prejudice.

In August 2019, Lomax, representing himself again, moved to reopen his post-conviction case.  In November 2019, counsel entered an appearance on Lomax's behalf. In January 2020, Lomax, through counsel, filed an amended petition for post-conviction relief.

As subsequently amended, Lomax's petition contained three allegations of error. First, it alleged that the State had violated its obligations under *Brady v. Maryland*, 373 U.S. 87 (1963), by withholding exculpatory information pertaining to the credibility of Hersl, Detective Burns, and Detective Ilgenfritz.  Second, the petition alleged that Lomax's trial counsel had rendered ineffective assistance because he failed to object to an assertion by the State in closing argument and failed to highlight a medical record that, Lomax said, refuted the State's assertion.  Third, and finally, the petition alleged that trial counsel also rendered ineffective assistance because he failed to use the surveillance video from the liquor store near the scene of the shooting.

9

On July 31, 2020, Lomax served an Assistant State's Attorney with a subpoena requiring her to appear at the hearing on his post-conviction petition and to produce the following documents: "*Brady* material, including impeachment information, including but not limited to police Internal Affairs files for Daniel Hersl, John Burns, [and] Howard Ilgenfritz, from 1/11/2011 to present."

The State moved to quash the subpoena. In support of its motion, the State argued that the individual prosecutor and the State's Attorney's Office were not the custodians of records for the Baltimore City Police Department; that the IAD files were privileged under the Maryland Public Information Act (the "PIA");[4] that the State must disclose IAD files only in active criminal proceedings, which this was not, and only when a court finds that there is a reasonable probability that a review of the records would result in the discovery of admissible evidence;[5] that Lomax, in any event, had not shown a reasonable probability that the IAD records would result in the discovery of admissible evidence; and that the subpoena was overly broad, in that it extended to records that did not exist at

[4] At the time of the subpoena, Maryland Code (2014, 2019 Repl. Vol.), § 4-311 of the General Provisions ("GP") Article, required a custodian to deny a request for the inspection of IAD records because they were considered to be "personnel records." *Maryland Dep't of State Police v. Dashiell*, 443 Md. 435, 458-59 (2015); *see also Glass v. Anne Arundel County*, 453 Md. 201, 244 (2017); *Montgomery County v. Shropshire*, 420 Md. 362, 383 (2011). As discussed below, GP § 4-311 was amended, effective October 1, 2021, to state that, in general, "a record relating to an administrative or criminal investigation of misconduct by a police officer, including an internal affairs investigatory record, a hearing record, and records relating to a disciplinary decision, is not a personnel record for purposes" of the statute. At present, therefore, a custodian may, but need not, deny a request for the inspection of IAD records. *See* GP § 4-351(a).

[5] *See, e.g.*, *Fields v. State*, 432 Md. 650 (2013).

the time of Lomax's criminal trial. The State did not assert that it lacked any responsive information or that it had produced everything that *Brady* required it to produce at Lomax's criminal trial.

In response, Lomax argued that the State's Attorney's Office had "constructive" possession of information pertaining to the credibility of its witnesses[6] and that the statutory protection for IAD files did not apply to exculpatory information outside of the IAD files themselves. He claimed that he could make the requisite showing to overcome the protection for the IAD files. He supported his claim with a number of documents, including court orders requiring the disclosure of Hersl's IAD records in other cases; documents pertaining to Hersl's criminal convictions, including documents containing allegations that Hersl had submitted false arrest reports; and a newspaper article containing an allegation that Hersl and Detective Burns had planted evidence.[7] Lomax disputed the State's assertion that his criminal conviction extinguished his right to *Brady* material: a "*Brady* violation," he argued, "does not disappear just because the State has managed to conceal the violation until after it obtains a conviction."

### Proceedings to Quash Lomax's Subpoena for "*Brady* Material"

On March 22, 2021, the circuit court held a hearing on the State's motion to quash Lomax's subpoena.

---

[6] *See, e.g.*, *Robinson v. State*, 354 Md. 287, 309 (1999).

[7] Justin Fenton, *Baltimore man served time for having gun he says was planted by a corrupt city police officer. Now he wants his record cleared*, Baltimore Sun (June 29, 2018).

11

In support of its motion, the State argued that, "at its core," Lomax's subpoena was "a pretrial discovery motion," but that the Maryland Uniform Postconviction Procedure Act did not permit discovery. The State argued that the circuit court, sitting as a post-conviction tribunal, lacked "fundamental jurisdiction," to reopen pre-trial discovery in post-conviction petitions. Citing *District Attorney's Office for the Third Judicial District v. Osborne*, 557 U.S. 52 (2009), and *Washington v. State*, 450 Md. 319 (2016), the State argued that Lomax's *Brady* rights ended upon his conviction.[8] Thus, the State argued, Lomax may have had the right to obtain IAD records at his trial, but did not have the right to obtain them in a post-conviction proceeding. The State also argued that Lomax had "waived" the right to obtain the confidential IAD records because he did not ask the trial court to review them in order to determine whether the State should be required to produce them at his criminal trial.[9]

---

[8] As discussed in greater detail later in this opinion, *Osborne* held that the Due Process Clause of the Fourteenth Amendment does not require a State to make evidence available for DNA testing to a person who has been convicted of a crime. *District Attorney's Office for Third Judicial District v. Osborne*, 557 U.S. at 69; *id.* at 72. *Washington* held that the Due Process Clause of the Fourteenth Amendment and the analogous provision of the Maryland Declaration of Rights do not invalidate a statute that denied access to DNA testing to a person who had been convicted of conspiracy to commit murder, but granted access to those convicted of statutorily-defined crimes of violence. *Washington v. State*, 450 Md. at 339-41. Both cases proceed from the premise that, once defendants have been convicted of a crime, they have "only a limited interest in postconviction relief." *District Attorney's Office for the Third Judicial District v. Osborne*, 557 U.S. at 69; *Washington v. State*, 450 Md. at 336. According to *Osborne*, "*Brady* is the wrong framework" for analyzing the extent of someone's constitutional liberty interest once they have "already been found guilty at a fair trial." *District Attorney's Office for Third Judicial District v. Osborne*, 557 U.S. at 69.

[9] *See Fields v. State*, 432 Md. at 668.

In response, Lomax argued that he was focusing on the IAD files, but was also

asking for anything bearing on the officers' credibility. The State, he observed, had not

said whether it had any documents that were responsive to the subpoena. From the

State's silence, he inferred that the State either had failed to look for responsive

documents or could not truthfully say that it had no responsive documents. He argued

that he was entitled to conduct what he called "discovery" in a post-conviction action

because Rule 4-406 allows a post-conviction petitioner to present evidence at a hearing,[10]

and Rule 4-265 allows a petitioner to use a subpoena to compel the production of

documents and the appearance of witnesses at a hearing.[11] He distinguished *Osborne* on

---

[10] Rule 4-406 provides as follows:

**(a) When Required.** A hearing shall be held promptly on a petition under the Uniform Post Conviction Procedure Act unless the parties stipulate that the facts stated in the petition are true and that the facts and applicable law justify the granting of relief. If a defendant requests that the court reopen a post conviction proceeding that was previously concluded, the court shall determine whether a hearing will be held, but it may not reopen the proceeding or grant the relief requested without a hearing unless the parties stipulate that the facts stated in the petition are true and that the facts and applicable law justify the granting of relief.

**(b) Judge.** The hearing shall not be held by the judge who presided at trial except with the consent of the petitioner.

**(c) Evidence.** Evidence may be presented by affidavit, deposition, oral testimony, or in any other form as the court finds convenient and just. In the interest of justice, the court may decline to require strict application of the rules in Title 5, except those relating to the competency of witnesses.

**(d) Presence of Petitioner.** The petitioner has the right to be present at any hearing on the petition.

[11] Rule 4-265 provides as follows:

**(a) Definitions.**

(1) *Trial.*  For purposes of this Rule, "trial" includes hearing.

(2) *Trial Subpoena.*  For purposes of this Rule, "trial subpoena" includes hearing subpoena.

**(b) Issuance.**  A subpoena shall be issued by the clerk of the court in which an action is pending in the following manner:

(1)  On request of a party, the clerk shall prepare and issue a subpoena commanding a witness to appear to testify at trial.  The request for subpoena shall state the name, address, and county of the witness to be served, the date and hour when the attendance of the witness is required, and which party has requested the subpoena.  If the request is for a subpoena duces tecum, the request also shall designate the relevant documents, recordings, photographs, or other tangible things, not privileged, that are to be produced by the witness.

(2)  On request of a party entitled to the issuance of a subpoena, the clerk shall provide a blank form of subpoena which shall be filled in and returned to the clerk to be signed and sealed before service.

(3)  On request of a member in good standing of the Maryland Bar entitled to the issuance of a subpoena, the clerk shall issue a subpoena signed and sealed by the clerk, which the attorney shall fill in before service.

(4)  An attorney of record in a pending action who is a registered user under Rule 20-101 may obtain from the clerk through MDEC, for use in that action, an electronic version of a blank form of subpoena containing the clerk's signature and the seal of the court, which the attorney may download, print, and fill in before service.

(5)  Except as provided in subsections (b)(3) and (b)(4) of this Rule, a person other than the clerk may not copy and fill in any blank form of subpoena for the purpose of serving the subpoena.

**(c) Issuance of Subpoena Duces Tecum.**  A subpoena duces tecum shall include a designation of the documents, recordings, photographs, or other tangible things, not privileged, that are to be produced by the witness.

the ground that it held that a person who had been convicted of a crime did not have a constitutional right to DNA testing; he argued that he was not asking for new tests, but for the State to produce "material that it already has, what it already knows." In response to a question from the court, he agreed that the State could not produce what it did not have (and thus that, at his trial in 2013, the State could not produce information that did not come to light until 2017). He argued, however, that some of the alleged misconduct occurred while he still had the right to move for a new trial—i.e., before his *Brady* rights would, in his view, have been extinguished.

In its brief rebuttal argument, the State reiterated its contention that Lomax was attempting to get what it called "pretrial discovery" in a post-conviction proceeding.

The court granted the State's motion to quash. In announcing its ruling, the court began by stating that its "decision only has to do with whether or not discovery will take place in this particular case." It noted that the UPPA contained no authorization for discovery. It also noted that drafters of the uniform act have propounded an amended version that permits discovery, but that the Maryland General Assembly has not adopted that amendment. The court added:

> **(d) Filing and Service.** Unless the court waives the time requirements of this section, a request for subpoena shall be filed at least nine days before trial in the circuit court, or seven days before trial in the District Court, not including the date of trial and intervening Saturdays, Sundays, and holidays. At least five days before trial, not including the date of the trial and intervening Saturdays, Sundays, or holidays, the clerk shall deliver the subpoena for service pursuant to Rule 4-266(b). Unless impracticable, there must be a good faith effort to cause a trial subpoena to be served at least five days before the trial.

There is no case law, there is no statute or rule to support the right to discovery in post-conviction. Discovery, request for documents, and particularly where it obligates the State . . . does not live in the post-conviction statute, and there is no case law that give this court any guidance whatsoever. There is no statute. There is no rule.

The court agreed that a post-conviction petitioner "could subpoena people" and "bring in evidence." In the court's opinion, however, the subpoena power did not permit a petitioner to subpoena information that the State had been obligated to produce at trial: "it does not extend to the State's obligation to provide you something that should have been provided, or in your words, should have been provided in trial." On the other hand, the court opined that a petitioner could use a subpoena to compel the State to produce information that it had produced at the trial, such as body-worn camera footage.

### The Hearing on the Post-Conviction Petition

Lomax proceeded on his post-conviction petitions on two grounds. First, Lomax claimed that the State violated *Brady* by failing to disclose information relating to the credibility of Hersl, Detective Burns, and Detective Ilgenfritz. Second, he raised two separate claims of ineffective assistance of counsel. Specifically, he asserted that trial counsel was ineffective in failing to use the victim's medical records to show that the weapon retrieved in this case could not have been used in the shooting. He also asserted that trial counsel was ineffective in failing to use surveillance video from a nearby business to dispute details relied on by the prosecution.

#### *Brady Violation*

In support of his *Brady* claim, Lomax managed to assemble a few scraps of evidence even without a subpoena. He alleged that, between 2007 and 2010, Baltimore

16

City settled three lawsuits against Hersl, two of which alleged the use of excessive force, and one of which alleged a false arrest. He showed that, between 2013 and 2016, Detective Burns was the subject of several IAD complaints for false arrest and excessive force. He also showed that, in approximately 2018, Detective Burns was accused of planting a gun on one man and stealing money from him in 2014 and of robbing another man in 2015. Finally, he showed that, between 2015 and 2019, Detective Ilgenfritz was the subject of at least three IAD complaints for false arrest, "general" misconduct, and "neglect."

The court found that the State did not violate *Brady* in failing to disclose the settlements involving Hersl. The court reasoned that the settlements were neither exculpatory nor impeachment evidence, nor were they material in Lomax's criminal trial. The court also reasoned that, even if the settlements fell within the definition of exculpatory or impeachment evidence, Lomax had failed to demonstrate that he was prejudiced by the State's failure to disclose them. In support of that conclusion, the court cited what it called the "overwhelming" evidence against Lomax.

The court went on to find that the State had not violated *Brady* in failing to disclose the IAD complaints and other allegations against Detective Burns and the complaints against Detective Ilgenfritz. The court explained that none of those allegations were made until Lomax's trial and sentencing were complete.[12] The State, the

---

[12] In fact, at least two of the allegations against Detective Burns appear to concern events that occurred before Lomax's sentencing.

17

court observed, cannot commit a *Brady* violation by failing to disclose information that did not come to light until after the trial was over.

*Ineffective Assistance of Counsel*

### A. Medical Records

In support of his second claim, that counsel rendered ineffective assistance, Lomax argued that trial counsel failed to highlight exculpatory information in the victim's medical records and failed to object to the State's contrary interpretation of the records in closing.

According to Lomax, there are ambiguities within the records themselves regarding how many bullet holes were in the victim's body following the shooting. Two pages indicate that there were five holes (including exit wounds), while other sections indicate that there were a greater number of holes. Lomax contended that these other sections prove that the victim must have been hit by more than three bullets. This information, he argued, bolstered his claim that the six-shot revolver recovered by the police could not have been the gun used to shoot the victim, as there were still three bullets in the chamber when it was recovered.

The court held that trial counsel did not perform deficiently by not using the medical records to dispute the number of shots fired. In support of that conclusion, the court observed that, based on the victim's testimony that he was shot six or more times, counsel "vehemently argued" that the six-shot revolver could not have been the gun used

18

in the shooting.[13]  In other words, counsel argued that the six-shooter could not have been the weapon used by the assailant; he simply used evidence other than the ambiguous medical records to do so.

The court similarly held that counsel did not perform deficiently in not objecting to the State's interpretation of the records during closing.  The court reasoned, first, the trial court had "correctly" overruled an objection by the co-defendant's counsel to the State's characterization of the medical records during closing.  In addition, the court reasoned that, because of the ambiguities within the medical records, the evidence could support multiple interpretations.  Thus, the court concluded that it would have been a deficient strategy for trial counsel to object to something that was not objectionable.

**B. Surveillance Video**

Lomax next argued that trial counsel's performance was deficient because he failed to use the surveillance video of the area near the crime scene recovered from a liquor store.  The footage was of great importance, Lomax argued, because it did not show anyone matching his height or description, nor did it show the suspects turning right before Detective Ilgenfritz gave chase, as he testified.

This issue was first raised during the hearing on Lomax's motion for a new trial on April 28, 2014.  At that hearing, the trial judge called the video a "visually poor piece of evidence" that presented "an incomplete and rather unclear recording of events near the

---

[13] The victim actually testified that he was shot six times, not six "or more" times. The reference to six "or more" shots appears to have been an embellishment by trial counsel.

scene of the shooting." The trial court observed that because the video is taken from an elevated position, it is impossible to determine the heights or facial features of anyone. Furthermore, the video stalls and skips in time and is of poor quality overall. Of significance, at approximately 19:31:32, the video shows people who appear to be startled and running away from the camera (perhaps as a result of the gunshots); then, however, the video skips to 19:33:07, where it shows several people running back toward the camera.

Upon its review of the video, the circuit court agreed with the trial court's observations that the video was a visually poor piece of evidence and an incomplete version of the events that occurred on the day of the crime. Thus, the court concluded that trial counsel was not unreasonable in determining that the video would have no value.

On June 16, 2021, by written opinion, the circuit court denied Lomax's petition for post-conviction relief on both grounds. Lomax filed an application for leave to appeal, which we granted.

## QUESTIONS PRESENTED

On appeal, Lomax presents three questions, which we have condensed.

1. Did the circuit court properly quash Lomax's subpoena?

2. Did the circuit court properly conclude that trial counsel did not render ineffective assistance?[14]

---

[14] The questions from Lomax's brief are:

1. Did the post-conviction court err in quashing Mr. Lomax's subpoena?

20

## I. The Brady Claim

### A. Brady: An Overview

In the landmark case of *Brady v. Maryland*, 373 U.S. 83, 87 (1963), the United

States Supreme Court held that "the suppression by the prosecution of evidence favorable

to an accused upon request violates due process where the evidence is material either to

guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." The

category of "evidence favorable to an accused" includes both exculpatory evidence and

evidence that "the defense might have used to impeach the [State's] witnesses[.]" *United

States v. Bagley*, 473 U.S. 667, 676 (1985); *accord Kyles v. Whitley*, 514 U.S. 419, 433

(1995); *Conyers v. State*, 367 Md. 571, 606 (2002); *Wilson v. State*, 363 Md. 333, 345-46

(2001); *see also Byrd v. State*, 471 Md. 359, 372 (2020) (stating that "*Brady v. Maryland*

and its progeny guarantee to a criminal defendant who stands trial the right to receive

material exculpatory and impeachment evidence in the possession of the State[]");

*Canales-Yanez v. State*, 472 Md. 132, 158 (2021) (same). In *United States v. Agurs*, 427

U.S. 97, 107 (1976), the Court expanded *Brady* to require the prosecution to disclose

---

2. Did the post-conviction court err by adopting a clearly erroneous view of the victim's medical records and excusing trial counsel's failure to inform the jury about exculpatory facts in those records?

3. Did the post-conviction court err in finding that trial counsel's decision not to show a surveillance video was "not unreasonable"?

favorable evidence in the absence of a request by the accused. *Accord Strickler v. Greene*, 527 U.S. 263, 280 (1999); *see United States v. Bagley*, 473 U.S. at 682.

Evidence is "material," for purposes of *Brady*, "'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Strickler v. Greene*, 527 U.S. at 280 (quoting *United States v. Bagley*, 473 U.S. at 682); *accord Conyers v. State*, 367 Md. at 610-11; *Wilson v. State*, 363 Md. at 347; *Ware v. State*, 348 Md. 19, 47 (1997). "[A] 'reasonable probability'" is "'a probability sufficient to undermine confidence in the outcome.'" *United States v. Bagley*, 473 U.S. at 682 (quoting *Strickland v. Washington*, 466 U.S. 668, 694 (1984)); *accord Conyers v. State*, 367 Md. at 611; *Wilson v. State*, 363 Md. at 347 n.3; *Ware v. State*, 348 Md. at 47.[15] Under *Brady*, "[t]here is no distinction between exculpatory evidence and impeachment evidence." *Ware v. State*, 348 Md. at 37.

The *Brady* rule "encompasses evidence 'known only to police investigators and not to the prosecutor.'" *Strickler v. Greene*, 527 U.S. at 280-81 (quoting *Kyles v. Whitley*, 514 U.S. at 438); *accord Conyers v. State*, 367 Md. at 602 (stating that "[f]acts known to the police will be imputed to the State for *Brady* purposes"). "In order to comply with *Brady*, therefore, 'the individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in this case,

---

[15] The ordinary test of materiality does not apply if "the undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and that the prosecution knew, or should have known, of the perjury." *United States v. Agurs*, 427 U.S. at 103. In that event, "the conviction" is "fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury." *Id.* (footnote omitted); *accord Conyers v. State*, 367 Md. at 610.

including the police.'" *Strickler v. Greene*, 527 U.S. at 281 (quoting *Kyles v. Whitley*, 514 U.S. at 437). The individual prosecutor also has a duty to disclose "information possessed by other prosecutors in the same office." *State v. Williams*, 392 Md. 194, 211 (2006); *see also id.* at 223 ("in deciding the coverage area of the *Brady* obligation, it is proper to consider the State's Attorney Office as a single entity[]"). "When the core of the State's argument relies on the testimony of an essential witness, the State has a duty to discover anything, and everything, that concerns that witness's credibility and, thus, potential for impeachment." *Id.* at 210. *Brady* violations "include both the failure to search for, and the failure to produce, such evidence." *State v. Williams*, 392 Md. at 210 (citing *In re Sealed Case*, 185 F.3d 887, 892 (D.C. Cir. 1999)).

"To establish a *Brady* violation, the defendant must establish (1) that the prosecutor suppressed or withheld evidence that is (2) favorable to the defense—either because it is exculpatory, provides a basis for mitigation of sentence, or because it provides grounds for impeaching a witness—and (3) that the suppressed evidence is material." *Ware v. State*, 348 Md. at 38; *accord Canales-Yanez v. State*, 472 Md. at 158.

*Brady* violations are a frequent subject of proceedings under the UPPA, the statute under which Lomax proceeded. *See*, *e.g.*, *Harris v. Maryland*, 407 Md. 503, 506 (2009); *State v. Williams*, 392 Md. at 202; *Conyers v. State*, 367 Md. at 585; *Wilson v. State*, 363 Md. at 338.

At the time of Lomax's trial and of the post-conviction hearing, IAD records were treated differently from other *Brady* material. Because IAD records were deemed to be

confidential personnel records at that time,[16] a criminal defendant could obtain them only by demonstrating a "need to inspect" the records and persuading the court, after an in camera review, that they might reveal or lead to admissible evidence. *See generally Fields v. State*, 432 Md 650, 666-69 (2013).[17]

### B. The Subpoena for "Brady Material"

The central question in this case is whether the circuit court erred in quashing Lomax's subpoena for "*Brady* material, including impeachment information, including but not limited to police Internal Affairs files for Daniel Hersl, John Burns, [and] Howard Ilgenfritz, from 1/11/2011 to present," i.e., the date of the subpoena, July 31, 2020. As the State observes in its brief, the subpoena, on its face, was overly broad in that it purported to require the production of documents that did not even exist at the time of Lomax's trial. The State did not, however, request a protective order limiting the scope of the subpoena to those materials that the State possessed at the time of trial. Instead, the State moved that the court quash the subpoena in its entirety. The court granted the motion.

---

[16] *See supra* n.4.

[17] It appears that, at around the time of Lomax's trial, the Baltimore City State's Attorney's Office used the police department's internal affairs files "to identify potentially unreliable officers" and had "developed software to run searches for the officers who were involved in a case." Bromwich Report, p. 130. "If the search turned up allegations of misconduct that related to the integrity and credibility of the officer, prosecutors would prepare a one paragraph summary for defense counsel." *Id.*; *see id.*, p. 132 (reporting that "[p]rosecutors would share a brief description of the alleged misconduct of potential officer witnesses with defense counsel under a confidentiality agreement"). Defense counsel would then have the opportunity to obtain an order requiring the disclosure of the entire file. *Id.*

On appeal, Lomax's characterization of his subpoena is quite different from the subpoena that the circuit court considered. Lomax has tacitly abandoned his demand for "*Brady* material . . . from 1/11/2011 to present," i.e., the date of the subpoena, July 31, 2020. Instead, he now describes his subpoena as "a request for the State to produce information it was required to produce at the time of trial." "All" he now claims to seek, "via subpoena, is evidence which should have been disclosed nine years ago." And although he highlighted his demand for IAD records in the circuit court, he now says that this Court "need not determine whether" he "was entitled to disclosure of IAD records in his post-conviction proceedings because [the records] are no longer privileged" as a result of a statutory amendment that took effect on October 1, 2021.[18]

In view of Lomax's recharacterization of his subpoena, the main issue in this case has become whether a post-conviction petitioner can use a subpoena to obtain exculpatory information that *Brady* obligated the State to produce, including exculpatory information that the State may have wrongly failed to produce.

At the State's instigation, the circuit court quashed Lomax's subpoena on the ground that a post-conviction petitioner could not obtain what it called "discovery." The court acknowledged that a petitioner can use a subpoena to compel the attendance of witnesses and the production of evidence at the post-conviction hearing. The court also acknowledged that a petitioner could use a subpoena to compel the State to produce evidence that it had produced at trial. The court asserted, however, that a petitioner could

---

[18] See n.4, above, for a description of the recent change in the law regarding the status of IAD records.

25

not use a subpoena to compel the State to produce what "should have been provided" at trial.

The State offers something less than a full-throated defense of the circuit court's rationale. According to the State, "[t]he court found that Lomax's subpoena was an attempt to obtain what *amounted to* discovery from the prosecutor." (Emphasis added.) Similarly, the State argues that the subpoena "demanded *what amounts to discovery* from the prosecutor after" Lomax had been convicted and "the discovery obligation" under *Brady* "had ended." (Emphasis added.) At the same time, however, the State suggests that Lomax could have subpoenaed "the prosecutor to produce her trial file (less privileged materials) from the now[-]closed criminal prosecution so that he could examine its contents to determine what was and was not disclosed to him prior to trial." And the State suggests that Lomax could have subpoenaed "the prosecutor to testify about whether she was aware prior to or at trial of any internal affairs investigations involving the three police officers." Thus, the State, in contrast to the circuit court, suggests that Lomax actually could use a subpoena "to determine" (i.e., to discover) whether the State provided at least some of what it was obligated to provide at trial.[19]

In evaluating the merits of the circuit court's ruling, we can agree that under the UPPA a petitioner has no right to pretrial discovery as it is practiced in ordinary civil

---

[19] A subpoena for the prosecutor's file, however, would not necessarily determine whether the State had produced all of the exculpatory information that it was required to locate and produce, because that subpoena would not cover information known to another prosecutor in the same office or information known to the police or another arm of the prosecution. *Strickler v. Greene*, 527 U.S. at 281; *State v. Williams*, 392 Md. at 210-11.

litigation.  By its terms, the statute does not authorize pretrial discovery; the statute is

based on a model act that has been amended to authorize pretrial discovery, but the

Maryland General Assembly has not adopted those amendments; and Chapter 400 of

Title 4 of the Maryland Rules, which "govern[s] . . . post conviction procedures,"[20] does

not authorize anything resembling pretrial discovery in civil cases.[21]

But although a trial subpoena *duces tecum* bears a distant resemblance to one tool

of pretrial discovery—a request for the production of documents—a trial subpoena is not

a pretrial discovery device.  It is a mechanism for compelling the attendance of witnesses

or the production of documents or other tangible things at a trial or hearing.  It is

incorrect to equate the use of a trial subpoena with pretrial "discovery."

Rule 4-265 concerns subpoenas in post-conviction proceedings, as well as other

proceedings.  Rule 4-265(b) expressly authorizes the issuance of a "trial subpoena," and

Rule 4-265(a)(1) states that the term "trial" includes a "hearing."  Rule 4-406(a) generally

requires a court to hold a "hearing" in a post-conviction action, and Rule 4-406(c)

permits the parties to present evidence at the hearing "by affidavit, deposition, oral

testimony, or in any other form as the court finds convenient and just."  The rules,

therefore, expressly authorize a post-conviction petitioner, like Lomax, to issue a

---

[20] *See* Md. Rule 4-101.

[21] As the State observes, however, the Maryland Rules once did allow for civil
discovery in post-conviction proceedings.  Michael A. Millemann, *Collateral Remedies
in Criminal Cases in Maryland: An Assessment*, 64 Md. L. Rev. 968, 1008 (2005) (citing
*State v. Giles*, 239 Md. 458, 467-68 (1965), *vacated on other grounds*, 386 U.S. 66
(1967)).

subpoena for the post-conviction hearing that the court was required to hold. The court erred in quashing the subpoena on the premise that it was an unauthorized effort to obtain pretrial "discovery."[22]

When the State says that Lomax's subpoena "amounts to discovery from the prosecutor," the State appears to mean that the subpoena required the State to provide the "discovery" that *Brady* obligated it to provide at Lomax's trial. The State seems to agree that Lomax could have used a subpoena to obtain at least some of that "discovery," because the State says that a petitioner could use a subpoena to require "the prosecutor to produce her trial file (less privileged materials) from the now[-]closed criminal prosecution so that he could examine its contents to determine what was and was not disclosed to him prior to trial." In the State's view, however, the problem with the subpoena appears to be that it required the State to ascertain whether the prosecutor had produced everything that *Brady* required her to produce—which is not just the non-privileged, exculpatory information in her own file, but also the exculpatory information "'known to the others acting on the government's behalf in this case, including the police,'" (*Strickler v. Greene*, 527 U.S. at 281 (quoting *Kyles v. Whitley*, 514 U.S. at 437)), as well as any exculpatory "information possessed by other prosecutors in the same office." *State v. Williams*, 392 Md. at 211. In effect, in arguing that the court

---

[22] Although none of the parties identified this issue, a reader might wonder whether the reference to a "deposition" in Rule 4-406(c) undermines the conclusion that discovery is not permitted in a post-conviction action. One explanation is that the term "deposition" may refer to a deposition taken by agreement of the parties—for example, of a witness who is unable to appear at the hearing. The term may also refer to a deposition taken in a related civil case.

correctly quashed the subpoena, the State maintains that Rule 4-265 contains an unwritten exception that prohibits a post-conviction petitioner from ascertaining whether the State fully complied with its *Brady* obligations at trial.

As it did in the circuit court, the State bases its contention on *District Attorney's Office for the Third Judicial District v. Osborne*, 557 U.S. 52 (2009), and *Washington v. State*, 450 Md. 319 (2016). Neither case supports the State's contention.

Osborne had been criminally convicted in state court in Alaska. He filed a federal civil rights action under 42 U.S.C. § 1983. He sought an order requiring the prosecutor to give him access to evidence that was introduced at his trial so that he could have DNA testing conducted on it at his expense. *Id.* at 60. Although Alaska law permitted DNA testing in limited circumstances (*id.* at 64-65), Osborne had not availed himself of those remedies, perhaps because he suspected that they would not apply to him.

The district court ordered the prosecutor to give Osborne access to the evidence. *Id.* at 60-61. The United States Court of Appeals for the Ninth Circuit affirmed, "relying on the prosecutorial duty to disclose exculpatory evidence recognized in" *Brady* and the cases that follow it. *Id.* at 61. In reaching that decision, the Ninth Circuit "acknowledge[d]" that the Supreme Court's "precedents 'involved only the right to *pre-trial* disclosure,'" but "concluded that the Due Process Clause also 'extends the government's duty to disclose (or the defendant's right of access) to *post-conviction* proceedings.'" *Id.* (quoting *Osborne v. District Attorney's Office for the Third Judicial District*, 521 F.3d 1118, 1128 (9th Cir. 2008)) (emphasis in original).

29

On certiorari, the United States Supreme Court rejected that conclusion. "The Court of Appeals went too far," the Court wrote, "in concluding that the Due Process Clause requires that certain familiar preconviction trial rights be extended to protect Osborne's postconviction liberty interest." *Id.* at 68. The court reasoned that "[a] criminal defendant proved guilty after a fair trial does not have the same liberty interests as a free [person]." *Id.* "The State accordingly has more flexibility in deciding what procedures are needed in the context of postconviction relief." *Id.* at 69. Once someone has "been found guilty at a fair trial," their "right to due process is not parallel to a trial right." *Id.*

Thus, the Court held, "*Brady* is the wrong framework" for identifying the liberty interests of a person who has been convicted of a crime. *Id.* "Instead," the relevant question was whether the "consideration of Osborne's claim within the framework of the State's procedures for postconviction relief 'offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental,' or 'transgresses any recognized principle of fundamental fairness in operation.'" *Id.* (quoting *Medina v. California*, 505 U.S. 437, 446, 448 (1992)) (internal quotation marks omitted in original).

A majority of the Court saw "nothing inadequate about the procedures Alaska ha[d] provided to vindicate its state right to postconviction relief in general, and nothing inadequate about how those procedures apply to those who seek access to DNA evidence." *Id.* at 69. "These procedures," the Court wrote, "are similar to those provided for DNA evidence by federal law and the law of other States, . . . and they are not

30

inconsistent with the 'traditions and conscience of our people' or with 'any recognized principle of fundamental fairness.'" *Id.* at 70 (quoting *Medina v. California*, 505 U.S. at 446, 448).[23]

In *Washington*, 450 Md. at 324, Washington had been convicted of conspiracy to commit murder and sentenced to life imprisonment. He filed a petition for postconviction DNA testing under Maryland Code (2001, 2008 Repl. Vol., 2016 Supp.), § 8-201 of the Criminal Procedure Article ("CP"). *Washington v. State*, 450 Md. at 325. The circuit court denied his petition on the ground that the statute authorized testing only for those who had been convicted of a "crime of violence" and that conspiracy to commit murder (unlike murder itself) was not defined as a "crime of violence." *Id.* at 325-26.

On appeal, Washington argued that, "by denying him access to postconviction DNA testing, the State ha[d] unconstitutionally denied him the opportunity to pursue postconviction relief under Maryland law." *Id.* at 336. In rejecting that contention, the Court began with the premise, enunciated in *Osborne*, that "criminal defendants who have been convicted have 'only a limited interest in postconviction relief' based on newly

---

[23] The Court went on to castigate Osborne for "[h]is attempt to sidestep state process through a new federal lawsuit[.]" *Id.* at 71. The Court stated:

> If he simply seeks the DNA through the State's discovery procedures, he might well get it. If he does not, it may be for a perfectly adequate reason, just as the federal statute and all state statutes impose conditions and limits on access to DNA evidence. It is difficult to criticize the State's procedures when Osborne has not invoked them.

*Id.*

discovered evidence because they have already received a fair trial." *Id.* at 336 (quoting

*Osborne v. District Attorney's Office for the Third Judicial District*, 557 U.S. at 69).

Thus, a State's procedures for postconviction relief will violate due process only if they

"'offend[ ] some principle of justice so rooted in the traditions and conscience of our

people as to be ranked as fundamental'" or "'transgress[ ] any recognized principle of

fundamental fairness in operation.'" *Id.* (quoting *Osborne v. District Attorney's Office

for the Third Judicial District*, 557 U.S. at 69).

Under this highly deferential standard, the Court held that the statute did not

deprive Washington of due process by limiting access to DNA testing based on the crime

of which a person had been convicted. *Id.* at 339. "The Legislature," the Court

explained, "has made a policy determination as to when the severity of an individual's

conviction and the relevance of new DNA evidence outweighs the administrative costs of

preserving DNA evidence and producing it on demand." *Id.* at 339-40. The Court added

that Washington had remedies under the UPPA, that he could file a petition for a writ of

actual innocence, and that he had had the opportunity to seek DNA testing at his criminal

trial. *Id.* at 340.[24]

*Osborne* and *Washington* tell us that, once someone has been convicted of a crime

in a fair trial, their liberty interests are far less expansive than they were before the

conviction. Hence, the states have considerable leeway in structuring post-conviction

---

[24] The Court went on to hold that the statute did not violate Washington's rights under the due process or "law of the land" clause in Article 24 of the Maryland Declaration of Rights, because it has usually construed Article 24 to be coextensive with the Due Process Clause of the Fourteenth Amendment. *Id.* at 340-41.

remedies.  Accordingly, due process does not require a state to make evidence available for DNA testing at the request of a person who has been convicted of a crime; nor does due process require a state to allow DNA testing for persons who have been convicted of some categories of crimes, but not of other similar crimes.

*Osborne* and *Washington* have little bearing on this case, because the rights at issue there derived solely from a guarantee of substantive due process.  Lomax's rights are different.  He bases his claim not on the alleged deprivation of an enfeebled liberty interest, but on a State statute that empowers a petitioner to challenge a conviction on the ground that it was obtained in violation of *Brady* and on a rule that authorizes the petitioner to use a subpoena to gather the evidence to support that claim.  Furthermore, Osborne and Washington were convicted at fair trials, while in Lomax's case the fairness of his trial is at the core of the dispute.

Under the UPPA, a person who has been convicted of a crime and is either confined or on parole or probation may commence a post-conviction proceeding to establish that "the sentence or judgment was imposed in violation of the Constitution of the United States or the Constitution or laws of the State[.]"  CP § 7-102(a)(1).  It is axiomatic that a sentence or judgment is "imposed in violation of the Constitution of the United States" when the State secures a criminal conviction without complying with the *Brady* obligations imposed by the Due Process Clause of the Fourteenth Amendment.  Therefore, a person who has been convicted and is either confined or on parole or probation may commence a post-conviction proceeding to establish that the State secured the conviction without complying with its *Brady* obligations.  *Id*.

33

Furthermore, in a post-conviction proceeding, either party, including the petitioner, has a right to issue subpoenas "commanding a witness to appear to testify" at the post-conviction hearing and "designat[ing] the relevant documents, recordings, photographs, or other tangible things, not privileged, that are to be produced by the witness." Md. Rule 4-265(b)(1). Therefore, in a post-conviction proceeding in which a petitioner adequately alleges that the State secured the conviction without complying with its *Brady* obligations, the petitioner must be able to issue a subpoena requiring a State witness to produce the materials that *Brady* obligated the State to disclose before the conviction was obtained.

The State is correct that *Osborne* and (to a lesser extent) *Washington* stand for the proposition that the State's *Brady* obligation—its obligation to produce exculpatory information to a criminal defendant, even without a request—ends when the defendant has "been found guilty at a fair trial." *District Attorney's Office for the Third Judicial District v. Osborne*, 557 U.S. at 69. Thus, the State is correct that a prosecutor's *Brady* obligation does not survive the conviction.[25] But it does not follow that, when Lomax brought a post-conviction action alleging a *Brady* violation at his trial, as he was statutorily entitled to do, and when he issued a subpoena to compel the production of evidence to support that allegation, as he was also entitled to do, the State had no

---

[25] Even after a conviction, however, a prosecutor has an ethical obligation "to disclose information that casts doubt on the correctness of the conviction." *Attorney Grievance Comm'n v. Cassilly*, 476 Md. 309, 382 (2021); *see Imbler v. Pachtman*, 424 U.S. 409, 427 n.25 (1976) (stating that prosecutors are "bound by the ethics of [their] office to inform the appropriate authority of after-acquired or other information that casts doubt upon the correctness of the conviction").

34

obligation to comply. Lomax is correct that a *Brady* violation does not "disappear" simply because the State allegedly obtained an unconstitutional conviction. To the contrary, the violation continues as long as an unconstitutional conviction affects the rights of the person who was convicted. As Lomax argues, the State is not "forevermore absolved from *Brady* compliance" merely "because it obtained a conviction in violation of *Brady*."

If we adopted the State's position (that a post-conviction petitioner is unable to use a subpoena to compel the production of the *Brady* material that the State was obligated to produce at the criminal trial), we would reward the State for violating a criminal defendant's *Brady* rights and successfully withholding exculpatory evidence until after it had secured a conviction. At the same time, we would interfere with the ability of post-conviction petitioners to vindicate their constitutional rights and would insulate some unconstitutional convictions from collateral attack under the UPPA. We decline to do so. Lomax correctly asserts that, if a post-conviction petitioner were unable to subpoena the *Brady* material that the prosecution failed to produce at trial, the only beneficiary would be "a prosecutor who has shirked the obligation and ethical duty to produce this evidence without judicial intervention."[26]

---

[26] In some cases, petitioners have succeeded in using the PIA to locate exculpatory information that the prosecution failed to disclose. *See*, *e.g.*, *Faulkner v. State*, 468 Md. 418, 444 (2020); *Smith v. State*, 255 Md. App. 544, 558 (2022), *vacated*, ___ Md. ___, 2023 WL 4071729 (June 20, 2023). It is conceivable, however, that a PIA request might fail to uncover everything that the prosecution wrongly withheld. Consequently, a subpoena may complement the other tools that a post-conviction petitioner can employ in attempting to demonstrate a *Brady* violation. There is nothing in the law stating that a

35

We hold that, when a post-conviction petitioner adequately alleges that the State secured the conviction without complying with its *Brady* obligations, the petitioner may issue a subpoena requiring a State witness to produce the materials that *Brady* obligated the State to disclose before the conviction was obtained. An adequate allegation requires more than a conclusory allegation or an assertion of law; it entails a clear statement of the facts necessary to establish a likely *Brady* violation.[27]

Here, Lomax has adequately alleged that the State secured his conviction without complying with its *Brady* obligations. Hersl was a key State witness at Lomax's criminal trial in 2013. A few years after Lomax was convicted, Hersl was indicted and convicted of racketeering, robbery, and other federal offenses, all of which involve deceit and mendacity. The jury found "that Hersl committed . . . four robberies or conspiracies to commit robbery under Maryland law and four acts of overtime-related wire fraud[.]" *United States v. Taylor & Hersl*, 942 F.3d at 210. None of Hersl's crimes occurred long after Lomax's conviction. *Id.*

In these circumstances, it is reasonable to infer that Hersl did not suddenly go bad, but that he had been a corrupt and dishonest police officer even before he committed the crimes for which he was convicted. It is equally reasonable to infer that, even before he committed those crimes, Hersl's corruption and dishonesty might have been known to

---

post-conviction petitioner is relegated to the PIA in attempting to uncover exculpatory information that the State failed to produce at the criminal trial.

[27] *Cf.* Md. Rule 2-305 (requiring "a pleading that sets forth a claim for relief" to "contain a clear statement of the facts necessary to constitute a cause of action").

36

some of the prosecutors in the Office of the State's Attorney for Baltimore City or to "'others acting on the government's behalf in this case, including the police.'" *Strickler v. Greene*, 527 U.S. at 281 (quoting *Kyles v. Whitley*, 514 U.S. at 437). The court erred, therefore, in quashing a subpoena to the extent that it requested the "*Brady* material" that the State was obligated to produce about Hersl at or before Lomax's trial.

The allegations about Detectives Burns and Ilgenfritz are less compelling than those about Hersl, but they are adequate to justify a subpoena. Lomax alleged that all three officers planted drugs on Kevron Evans (a.k.a., "Young Moose") on October 20, 2012, before Lomax's trial. Lomax also alleged that Detective Burns robbed Kenyon Paylor on January 2, 2014 (after Lomax's trial, but before he was sentenced), and that he robbed Herbert Tate on November 27, 2015. The Bromwich Report lists three incidents involving Detective Burns, the earliest of which occurred on November 5, 2014, within 18 months of Lomax's conviction and before Lomax was actually sentenced. Hersl was convicted of submitting a false incident report about how much money was seized from the defendant's person and safe in that incident. Bromwich Report, p. A2. The court also erred, therefore, in quashing a subpoena to the extent that it requested the "*Brady* material" that the State was obligated to produce about Detective Burns and Ilgenfritz at or before Lomax's trial.[28]

---

[28] In his reply brief, Lomax cites a *Daily Record* article that reports that the State's Attorney for Baltimore City dropped criminal charges against a man who alleged that in 2014 Hersl had planted drugs on him and that another officer "found" the drugs during a search. Madeleine O'Neill, *Baltimore Police Department faces 2 new lawsuits tied to discredited officers*, The Daily Record (Aug. 11, 2022). The man filed a civil suit against Hersl, Detectives Burns and Ilgenfritz, and other officers. *Id.* Although the circuit court

The State propounds a number of rear-guard arguments against this conclusion. None are persuasive.

First, the State argues that the subpoena was "misdirected" to the prosecutor, at least to the extent that it sought materials in the possession of the police. The argument has no merit. A subpoena *duces tecum* typically requires more than just the production of documents and tangible things in the recipient's actual, physical possession; it also requires the production of documents and tangible things in her custody or control. Here, the prosecutor had "control" over documents and tangible things that she was able to obtain from the police department. In any event, because the police are an arm of the prosecution, "the records are also constructively in the possession of the prosecution." *Robinson v. State*, 354 Md. at 309.

Second, the State argues that the subpoena was overly broad, because it purported to compel the production of information that did not exist until after Lomax's conviction. The State's complaint is mooted by Lomax's representation on appeal that he now seeks nothing more than what the State "was required to produce at the time of trial."

Third, the State invokes Rule 4-406, which concerns the manner in which evidence may be presented at a hearing on a post-conviction petition—specifically, "by affidavit, deposition, oral testimony, or in any other form as the court finds convenient and just." The State seems to argue that, by empowering the court to allow the

did not have the opportunity to consider this report (because it did not come out until more than a year after the ruling), it affords another reason for this Court to conclude that Lomax has an adequate basis to pursue his subpoena.

38

presentation of evidence in "any other form as the court finds convenient and just," the

rule empowers the court to curtail a petitioner's subpoena power. If that is the argument,

the State has it all wrong. Rule 4-266(c), governing protective orders, empowers a court

to quash or limit a subpoena in certain circumstances.[29] Rule 4-406(c), by contrast,

encourages liberality in the presentation of evidence at post-conviction hearings. It even

permits a court "to decline to require strict application of the rules" of evidence, "except

---

[29] Rule 4-266(c) provides:

**(c) Protective Order.** Upon motion of a party, a person named in the subpoena, or a person named or depicted in an item specified in the subpoena filed promptly and, whenever practicable, at or before the time specified in the subpoena for compliance the court, for good cause shown, may enter an order which justice requires to protect the party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one of the following:

(1) That the subpoena be quashed;

(2) That the subpoena be complied with only at some designated time or place other than that stated in the subpoena, or before a judge, or before some other designated officer;

(3) That certain matters not be inquired into or that the scope of examination or inspection be limited to certain matters;

(4) That the examination or inspection be held with no one present except parties to the action and their counsel;

(5) That the transcript of any examination or matters produced or copies, after being sealed, not be opened or the contents be made public only by order of court; or

(6) That a trade secret or other confidential research development or commercial information not be disclosed or be disclosed only in a designated way.

those relating to the competency of witnesses." Rule 4-406(c) has no bearing on the permissible scope of a subpoena.

Fourth, the State complains that Lomax's subpoena "was not focused on what tangible information the prosecutor had in her possession and control at the time of trial." The State's complaint fails to recognize that the *Brady* obligation goes beyond what the prosecutor actually knew or had and that it extends to information known to other prosecutors in the same office or to the police. As Lomax puts it, "The duty to disclose impeachment evidence also includes the duty to obtain it."

Finally, the State argues that Lomax "waived" his *Brady* claim because his application for leave to appeal did not challenge the court's ultimate finding that the State had not violated *Brady*. The court's finding is, however, tainted by its error in quashing Lomax's subpoena in its entirety and thus frustrating his ability to establish a *Brady* violation. Furthermore, the State made a similar "waiver" argument in opposing Lomax's application for leave to appeal. This Court would not have granted an application for leave to appeal from the ruling quashing the subpoena if we believed that that issue was academic in light of the court's ultimate finding.[30]

---

[30] Lomax was convicted in May of 2013, but he was not sentenced until December 1, 2014. He contends that his subpoena requires the State to produce "*Brady* material" through the date when he was sentenced and his conviction became final. In fact, he argues that his subpoena requires the State to produce "*Brady* material" for another year after his conviction became final, while he had the right to move for a new trial on the basis of newly discovered evidence under Maryland Rule 4-331(c). Because the circuit court quashed the subpoena in its entirety, it did not consider or decide the question of when the State's *Brady* obligation ended. Nor shall we. Md. Rule 8-131(a).

Lomax's request for IAD records stands on a different footing from his request for general *Brady* material. Under the law both at the time of his trial and at the time of the post-conviction hearing, IAD records were considered to be personnel records, which were "'mandatorily exempt from disclosure by the custodian of records' under the PIA." *Fields v. State*, 432 Md. at 666 (quoting *Montgomery County v. Shropshire*, 420 Md. 362, 383 (2011)). "[N]onetheless," under the law at that time, "[a] person facing criminal charges" might be entitled "to discovery of confidential personnel records." *Id.* "[I]n this context," a court was required to balance the "confidentiality interest" "against the confrontation and due process rights of the defendant." *Id.* If the criminal defendant demonstrated a "need to inspect" the records, by showing "a reasonable possibility that review of the records would result in discovery of usable evidence," the court was required to review the records in camera. *Id.* at 667. "The court's ultimate determination of whether to allow discovery of the sought-after information d[id] not rest on whether the records themselves are admissible at trial, but rather on whether disclosing that material to the seeking party would reveal or lead to admissible evidence." *Id.* at 668.

Lomax relied on this so-called "*Fields* test" in opposing the motion to quash his subpoena for the IAD records, and he relies on it on appeal. His reliance is misplaced. Had Lomax been seeking the IAD records at his criminal trial, the *Fields* test would have governed the court's decision. In the case before us, however, Lomax requested the IAD records in a post-conviction proceeding after he had been convicted at a criminal trial. The *Fields* test, which applied when "a person facing criminal charges" sought IAD records in order to exercise "the confrontation and due process rights" that belong to a

41

criminal defendant, did not apply in that post-conviction proceeding. Because a person who has been convicted of a crime does not have the same "confrontation and due process rights" as a person who is merely "facing criminal charges," the protection for IAD records, should, if anything, have been greater in a post-conviction case than in a criminal case.

Lomax argues that he satisfied the *Fields* test, but he does not explain why the test would have applied in a post-conviction case as opposed to a criminal trial. The court did not err in quashing Lomax's request for IAD records.

Lomax also argues that because the IAD records "are no longer privileged," we need not decide whether he was entitled to the disclosure of the IAD records that he sought to compel by means of his subpoena. He correctly observes that, effective October 1, 2021, GP § 4-311 was amended to add subsection (c)(1). That new subsection provides, in general, that: "a record relating to an administrative or criminal investigation of misconduct by a police officer, including an internal affairs investigatory record . . . is not a personnel record for the purposes of this section."[31] In other words, as of October 1, 2021, IAD records in general are no longer classified as "personnel records" under the PIA. As of October 1, 2021, therefore, a custodian of records is no longer required to deny a PIA request for the inspection of IAD records on the ground that they are

---

[31] "A record of a technical infraction," however, is still defined as a "personnel record" under the PIA. GP § 4-311(c)(2).

"personnel records." Instead, the custodian may, but need not, deny a request. GP § 4-351(a).

In his brief, Lomax "suggests" that "the most effective way to resolve this appeal is to provide that on remand he may renew his request for the production of [the IAD records] under law." Because the case must return to the circuit court for further proceedings pertaining to Lomax's right to subpoena the "*Brady* material" to which he was entitled at trial, and because the law governing access to IAD records has changed, we agree that, on remand, the court, in its discretion, may permit Lomax to renew his request for those records. We express no opinion as to whether the court should grant the request or how it should resolve the issue of access to the records if it grants the request: the parties did not brief those issues, nor were they considered or decided in the circuit court.[32]

In summary, the court erred in quashing Lomax's subpoena insofar as it required the State to produce the "*Brady* material" that the State should have produced at his criminal trial. The court, however, did not err in quashing Lomax's subpoena insofar as it required the State to produce the IAD records for Hersl and Detectives Burns and Ilgenfritz, but because of the change of law since the court's ruling, the court may allow Lomax to propound a new subpoena for those records.[33]

---

[32] Of course, Lomax can also attempt to obtain the IAD records through a PIA request. To the extent that he succeeds, a subpoena would become unnecessary.

[33] In the circuit court, the State argued that Lomax had waived his right to subpoena IAD records because he had not attempted to obtain the records (or at least those of which he was informed) at his trial. On appeal, the State does not pursue that

43

**II.**

Lomax contends that the circuit court erred in determining that trial counsel's performance was not prejudicially deficient. We disagree, and for the reasons discussed below, shall affirm this aspect of the judgment of the circuit court.

The Sixth Amendment to the United States Constitution and Article 21 of the Maryland Declaration of Rights guarantee criminal defendants the right to the assistance of counsel at critical stages of the proceedings against them. To ensure that the right to counsel provides meaningful protection, the right has been construed to require the "'effective assistance of counsel.'" *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771 n.14 (1970)); *accord Yaw Poku Podieh v. State*, 470 Md. 272, 290 (2020); *State v. Syed*, 463 Md. 60, 74 (2019); *accord State v. Sanmartin Prado*, 448 Md. 664, 681 (2016).

To establish a claim of ineffective assistance of counsel in violation of his constitutional rights, Lomax must satisfy the two-prong test articulated in *Strickland v. Washington*. The first prong requires Lomax to show that counsel's performance was deficient because he "made errors so serious that counsel was not functioning as the

---

argument, so we do not consider it. In this regard, we note that, according to Janice Bledsoe, who headed the Police Integrity Unit in the State's Attorney's Office from April 2011 until September 2012, Baltimore City prosecutors "had little information about the contents of IA files and derogatory information about officers—including allegations of corruption and untruthfulness—that resided in those files." Bromwich Report, p. 131. Thus, it is conceivable that, at the time of Lomax's trial, he was not informed of (and not given the opportunity to attempt to obtain) some of the IAD records of which he should have been informed.

'counsel' guaranteed . . . by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. at 687. The second prong requires Lomax to show that counsel's performance was so deficient that he was prejudiced by it. *Id.*

To satisfy the first prong, Lomax must show that the acts or omissions of counsel were the result of unreasonable professional judgment and that counsel's performance fell below an objective standard of reasonableness considering prevailing professional norms. *See, e.g.*, *Cirincione v. State*, 119 Md. App. 471, 484 (1998) (citing *Oken v. State*, 343 Md. 256, 283 (1996)); *see also Coleman v. State*, 434 Md. 320, 331 (2013). Because "[a] fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time[,]" "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Strickland v. Washington*, 466 U.S. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

To satisfy the second prong, Lomax must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694; *Harris v. State*, 303 Md. 685, 700 (1985). A "reasonable probability" is "'a probability sufficient to undermine confidence in the outcome.'" *Coleman v. State*, 434 Md. at 340 (quoting *Strickland v. Washington*, 466 U.S. at 694). "The benchmark for judging any claim of ineffectiveness must be whether

45

counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. at 686.

Whether Lomax received ineffective assistance of counsel is "a mixed question of fact and law." *State v. Purvey*, 129 Md. App. 1, 10 (1999). "[W]e will defer to the [post-conviction] court's findings of historical fact, absent clear error." *Cirincione v. State*, 119 Md. App. at 485 (citation omitted). But we exercise our "own independent judgment as to the reasonableness of counsel's conduct and the prejudice, if any." *State v. Jones*, 138 Md. App. 178, 209 (2001), *aff'd*, 379 Md. 704 (2004).

Lomax asserts two claims of ineffective assistance of counsel. In the first claim, Lomax argues that counsel was ineffective in two, related ways: (1) he failed to object in closing argument when the State said that the victim's medical records showed five bullet holes in his body and (2) he failed to use the medical records to show that the weapon retrieved in this case could not have been the one that was used in the shooting. In the second claim, Lomax argues that counsel was ineffective because he failed to use available video evidence to rebut the State's case and undermine the efficacy of its witnesses.

Lomax contends that he was prejudiced by his trial counsel's alleged failings because counsel "fail[ed] to marshal the existing evidence to both demonstrate Mr. Lomax's innocence—and more importantly—demonstrate that the State's position was bereft of support."

## A. Medical Record

At Lomax's trial, the State explained, in closing argument, why the medical evidence supported its contention that the weapon used to shoot the victim, Alonzo Tunnell, was the six-shot revolver containing three live cartridges and three spent casings. There, the State argued that two pages of medical records describe "five holes" in Tunnell's body as result of the shooting. According to the State, three shots could cause five holes (if some of the holes were exit wounds). Thus, the State argued, the six-shot revolver was (or could have been) the weapon that was used to shoot Tunnell even though it still contained three live cartridges.

Trial counsel did not object to the State's interpretation of the medical records at trial, nor did he present an alternative interpretation of the medical records (that the records showed six, rather than five, holes in Tunnell's body) during his own closing. However, counsel did argue that the revolver couldn't have been used in the shooting for different reasons: he cited Tunnell's testimony that he was shot six times or more and argued that Lomax's revolver "could never have fired six rounds because it only holds six rounds and three live rounds were left."

Lomax contends that he received ineffective assistance of counsel because the State could connect him to the shooting only if it could prove that Tunnell's injuries could be caused by just three bullets, and his interpretation of the medical evidence negates that possibility. He contends that his chance of acquittal by the jury was commensurate with his ability to show that the six-shot revolver could not have been used in the assault. Hence, he concludes that trial counsel was deficient in failing to

47

object to the State's presentation of the records and in failing to use the medical records

to argue that the gun that Lomax allegedly dropped was not the weapon used to shoot

Tunnell.

The circuit court rejected Lomax's contentions. It found, first, that the medical

records were susceptible to multiple interpretations—one page indicated that there were

five bullet holes, while another page was ambiguous as to whether there were five or six

bullet holes. Recognizing that it is often a bad strategy to object during closing

argument,[34] the court concluded that it would certainly have been bad strategy for counsel

to object to the State's closing argument in Lomax's trial, because the objection would

have been overruled—the State was free to argue its interpretation of the evidence.

The court also found that trial counsel had argued "vehemently" that the six-shot

revolver could not have been the weapon used in the shooting. For example, counsel had

cited Tunnell's testimony, claiming that he said that he had been shot six, seven, or eight

times, to argue that he could not have been shot with a six-shooter that contained three

live cartridges. The court concluded that counsel's performance was not deficient merely

because he did not use the medical records that make his point. "Trial counsel," the court

wrote, "argued the issue but chose to do it differently." "[That] does not mean that his

performance fell below the objective standard of reasonableness."

We see no error in the court's conclusions. First, Lomax has not rebutted the

strong presumption that the failure to object in closing argument was anything other than

---

[34] *See, e.g.*, *Kulbicki v. State*, 207 Md. App. 412, 452 (2012), *rev'd*, 440 Md. 33 (2014), *cert. granted*, *judgment rev'd*, 577 U.S. 1 (2015), *and aff'd*, 445 Md. 451 (2015).

sound trial strategy. *Strickland v. Washington*, 466 U.S. at 689. Second, it is a matter of pure hindsight and second-guessing to say that counsel should have used the ambiguous medical records, rather than the victim's own testimony, to attempt to show that the six-shooter could not have been the weapon used in the crime.

### B. Surveillance Video

In his second challenge to counsel's competence, Lomax faults his defense counsel for failing to use the surveillance video evidence from the liquor store to undermine the State's case. Lomax claims that the video does not corroborate the testimony of the law enforcement witnesses.

Specifically, Lomax argues that the video does not show a figure matching his description, nor does it show two suspects running from the scene as described by the police officers. Although Lomax admits that the video is "imperfect" and that it skips in time, he contends that no reasonable attorney should forego the use of visual evidence, even if imperfect, when it tends to contradict witness testimony. Lomax reasons that this video would have been useful to sow reasonable doubt because "a video showing *nothing* is, in fact, *something*."

Lomax is unable to raise this issue in a post-conviction proceeding. Under CP § 7-102(b), Lomax may pursue a post-conviction petition only if "the alleged error has not been previously and finally litigated or waived in the proceeding resulting in the conviction or in any other proceeding that [he] has taken to secure relief from [his] conviction." Under CP § 7-106(b)(1)(i)(3), "an allegation of error is waived when a petitioner could have made but intelligently and knowingly failed to make the allegation

49

. . . on direct appeal[.]"  In his motion for a new trial, Lomax contended that his trial counsel was ineffective because he did not employ the video; the court rejected that contention; and Lomax failed to challenge the ruling on direct appeal.  Therefore, he has waived the contention.

But even if Lomax had not waived the contention, we would find no error, because the record reflects that trial counsel made a reasonable, strategic decision not to use the video.

In its opinion on this subject, the circuit court began by observing that, in denying Lomax's motion for a new trial, the trial court had called the video a "visually poor piece of evidence" that presented "an incomplete and rather unclear recording of events near the scene of the shooting."  The circuit court noted the trial court's conclusion that the video alone would not create a substantial possibility of a different result.

After viewing the video, the circuit court rejected Lomax's claim of ineffective assistance.  The court observed that the video was taken from an elevated position, which makes it impossible to determine the height or facial features of anyone, and impossible to determine whether anyone was wearing a mask.  The court also observed that the video skips and stalls, at one key point omitting more than 90 seconds of activity.  In the court's view, the poor quality of the video supported trial counsel's explanation that he did not use the video (and told Lomax that he would not use the video) because "it was not [a] complete representation of what happened at the crime scene."  Accordingly, the court concluded that it was "not unreasonable" for trial counsel to determine that the video "would have no value."

We too have no reason to conclude that counsel was ineffective in electing not to show a video to the jury that was described by the trial court as "a visually poor piece of evidence" that presented "an incomplete and unclear recording of the events near the scene of the shooting." Trial counsel provided a reasonable explanation for his decision not to use the video. A reasonable strategic decision is not ineffective assistance of counsel. *Cirincione v. State*, 119 Md. App. at 485.

**JUDGMENT OF THE CIRCUIT COURT FOR BALTIMORE CITY AFFIRMED IN PART AND REVERSED IN PART. CASE REMANDED FOR FURTHER PROCEEDINGS CONSISTENT WITH THIS OPINION. COSTS TO BE PAID ONE-HALF BY APPELLANT AND ONE-HALF BY MAYOR AND CITY COUNCIL OF BALTIMORE.**